UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                   :

HIGHFIELDS CAPITAL I LP, HIGHFIELDS    :
CAPITAL II LP, AND HIGHFIELDS CAPITAL III  :
L.P.,                                         :
                                   :
              Plaintiffs,          :
                                   :
               v.              :
                                   :
BARRICK GOLD CORPORATION, AARON    :
REGENT, JAMIE SOKALSKY, AMMAR AL-    :
JOUNDI, PETER KINVER, IGOR GONZALES,  :
GEORGE POTTER and SYBIL VEENMAN,   :

              Defendants.
-----------------------------------------------------------------x

## COMPLAINT AND JURY DEMAND

Plaintiffs Highfields Capital I LP, Highfields Capital II LP, and Highfields Capital III

L.P. ("Plaintiffs") are purchasers of the common stock of Barrick Gold Corporation ("Barrick,"

or the "Company"). Plaintiffs, through their undersigned attorneys, by way of this Complaint

and Jury Demand, for their federal securities claims against Barrick and against Barrick's former

officers Aaron Regent, Jamie Sokalsky, Ammar Al-Joundi, Peter Kinver, Igor Gonzales, George

Potter and Sybil Veenman (the "Individual Defendants," and, collectively with Barrick,

"Defendants"), allege the following upon personal knowledge as to themselves and their own

acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their

attorneys, which investigation includes, among other things, a review and analysis of: Barrick's

filings with the U.S. Securities and Exchange Commission ("SEC"); resolutions issued by the

Environmental Commission of the Atacama Region of Chile concerning Barrick; documents

filed with or by Chile's Superintendent of the Environment concerning Barrick; pleadings, motion papers, and exhibits to declarations filed in the matter *In re Barrick Gold Securities Litigation*, 13-cv-03851-SAS, including internal Barrick documents; and public documents and media reports concerning Barrick.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiffs bring this action under federal law to recover for the investment losses they suffered as a result of numerous false and misleading statements made by Barrick and its representatives concerning Barrick's flagship gold mining project in the Andes Mountains known as "Pascua-Lama."  Unbeknownst to investors, the Pascua-Lama project was plagued by environmental infractions, poor project planning, and risk management failures by Barrick that resulted in Barrick ultimately abandoning the project.

2.      Barrick is the world's largest gold mining company.  Although based in Toronto, Barrick has mining operations around the globe.  These operations produce millions of ounces of gold every year.

3.      In 2009, Barrick was facing declining production levels at its existing gold mines. To offset this decline, Barrick pursued the development of a new generation of mines that it hoped would significantly increase its gold production at lower costs than its older mines. Pascua-Lama was supposed to be the crown jewel of Barrick's new generation of low cost mines.

4.      Barrick told investors that the development of Pascua-Lama on the border of Chile and Argentina was a "milestone event" for Barrick.  Gold reserves at Pascua-Lama totaled more than 18 million ounces and represented a significant source of future earnings for Barrick.

5.      Mining at Pascua-Lama, however, presented logistical challenges. Among other things, several environmentally sensitive glaciers were located on the proposed mining site. These glaciers provided a vital water source to the thousands of farmers and residents who lived in the valleys below.

6.      To be able to proceed with construction of the mine at Pascua-Lama, Barrick had to obtain the consent of the Chilean and Argentine authorities.  The governmental authorities ultimately gave their permission to Barrick to mine at Pascua-Lama, but only if Barrick agreed to comply with numerous conditions designed to protect the environment and the delicate ecosystem at Pascua-Lama.

7.      Between 2010 and 2012, as Barrick worked on constructing the mine, it made numerous public statements concerning its compliance with the conditions imposed by the Chilean and Argentine authorities and about the purportedly negligible impact that its activities were having on the environment.  Barrick also consistently represented to the public that it had a strong system of internal controls so that its disclosures concerning Pascua-Lama and the financial information it presented to investors were true, complete and accurate.

8.      Unbeknownst to investors, however, Barrick completely failed to comply with the conditions imposed by Chilean and Argentine authorities.  Resolutions and sanctions issued by local environmental commissions during the relevant time period demonstrate that Barrick blatantly disregarded its obligations by, among other things, failing to follow dust mitigation procedures, failing to properly implement a glacier monitoring program, and improperly storing

and disposing of harmful chemicals and other industrial waste.  Thus, Barrick totally disregarded its duty to protect the local environment at Pascua-Lama, allowing toxic dust to enter the air and water supply and damaging the surrounding glaciers.  In addition, Barrick failed to properly construct a water management system, the purpose of which was to prevent cyanide and sulfuric acid from entering the water supply that provided irrigation and drinking water to tens of thousands of people in the valleys below.

9.      Internal Barrick documents reveal the existence of numerous material weaknesses in Barrick's internal controls relating to the Pascua-Lama project.   Prior to proceeding with construction activities at Pascua-Lama, Barrick failed to establish a project management framework.   After construction began, the monthly reports submitted to Barrick's corporate headquarters were found to contain significant inaccuracies, the cost management process at Pascua-Lama was flawed, the program plans at Pascua-Lama were incomplete and not consistently updated, and there were internally-identified weaknesses in Barrick's risk management system at Pascua-Lama.

10.      Barrick's environmental infractions and the weaknesses in its internal controls rendered its public statements to the contrary materially false and misleading.   Moreover, Barrick's financial statements were inaccurate because Barrick should have recognized an impairment loss at Pascua-Lama.  Because Barrick failed to properly recognize an impairment loss at Pascua-Lama, it consistently materially overstated the carrying value of Pascua-Lama on its balance sheet, as well as the amount of its net income and earnings per share on its income statement.   These false and misleading statements artificially inflated the price of Barrick's common stock.

11.    In 2013, Barrick made a series of partial but inadequate disclosures about the problems at Pascua-Lama.   In May 2013, Chile imposed a massive fine on Barrick for environmental violations at Pascua-Lama, which led to a temporary halt of trading in Barrick's common stock on the New York Stock Exchange ("NYSE").   On June 28, 2013, Barrick announced that it expected to incur an impairment loss on the project of between $4.5 billion and $5.5 billion in the second quarter of 2013.   The Company also announced that it would be reducing its capital expenditures on Pascua-Lama in 2013 and 2014.    Then, on October 31, 2013, Barrick announced that it was suspending all construction at Pascua-Lama except for activities required for environmental and regulatory compliance.

12.    Today, Barrick is simply "holding" Pascua-Lama and spending the bare minimum of capital in order to do so.   As stated on Barrick's website, "in 2015, Barrick anticipates expenditures of approximately $170-$190 million for the project, including approximately $140-$150 million for care and maintenance, including water management system costs, and approximately $30-$40 million for other project costs, including those related to permit obligations in Argentina and Chile."

13.    To this date, no gold has ever been produced from Pascua-Lama.

14.    The effect of Defendants' misrepresentations was to artificially inflate the price of Barrick's common stock.   Plaintiffs purchased Barrick common stock on the New York Stock Exchange ("NYSE") between April 11, 2013 and September 20, 2013.   As the series of partial but inadequate disclosures about the problems at Pascua-Lama was released to the market, Plaintiffs suffered significant losses.

15.    Plaintiffs now bring this action to recover the damages they suffered as a result of Defendants' fraud.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred and had their primary effects in this District.

19.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## PARTIES

### A.     Plaintiffs

20.     Plaintiff Highfields Capital I LP is a Delaware limited partnership with its main office location in Boston, Massachusetts.  The dates on which Highfields Capital I LP purchased Barrick common stock on the NYSE during the relevant period are attached hereto as Exhibit A.

21.     Plaintiff Highfields Capital II LP is a Delaware limited partnership with its main office location in Boston, Massachusetts.  The dates on which Highfields Capital II LP purchased Barrick common stock on the NYSE during the relevant period are attached hereto as Exhibit A.

22.     Plaintiff Highfields Capital III L.P. is a Cayman Islands exempted limited partnership with its main office location in Grand Cayman, Cayman Islands.  The dates on which

Highfields Capital III L.P. purchased Barrick common stock on the NYSE during the relevant period are attached hereto as Exhibit A.

**B.**   **Defendants**

23.   Defendant Barrick Gold Corporation is the world's largest gold mining company. Barrick's head office and principal place of business is located in Toronto, Canada.  Barrick's common stock trades on the New York Stock Exchange under the ticker symbol "ABX." Barrick made false and/or misleading statements as alleged herein.

24.   Defendant Aaron W. Regent ("Regent") became President and Chief Executive Officer ("CEO") of Barrick on January 16, 2009.  He also served on Barrick's Board of Directors ("Board"), and as a member of the Corporate Responsibility Committee.  Regent was removed as President, CEO and from the Board on June 6, 2012.  Regent made false and/or misleading statements as alleged herein, including signing certifications to Barrick's 2010 and 2011 Annual Reports, and is also liable as a control person for the false and misleading statements alleged herein.

25.   Defendant Jamie C. Sokalsky ("Sokalsky") replaced Regent as President and CEO of Barrick, and as a member of Barrick's Board, on June 6, 2012.  Prior to that, Sokalsky served as Executive Vice President and Chief Financial Officer ("CFO") of Barrick, a position he held from 1999.  He originally joined Barrick as Treasurer in 1993.  He stepped down as Barrick CEO in September 2014.  Sokalsky made false and/or misleading statements as alleged herein, including signing certifications to Barrick's 2010, 2011 and 2012 Annual Reports, and is also liable as a control person for the false and misleading statements alleged herein.

26.   Defendant Ammar Al-Joundi ("Al-Joundi) replaced Sokalsky as Executive Vice President and Chief Financial Officer ("CFO") of Barrick when Sokalsky stepped into the CEO role.  Prior to becoming CFO, he was CFO of another mining company, Agnico Eagle Mines

Ltd., for two years.  Prior to that, Al-Joundi had worked at Barrick for eleven years in roles such as Senior Vice President, Business Strategy and Capital Allocation, and Senior Vice President, Finance.  Al-Joundi stepped down as Barrick CFO in February 2015.  Al-Joundi made false and/or misleading statements as alleged herein, including signing certifications to Barrick's 2012 Annual Report, and is also liable as a control person for the false and misleading statements alleged herein.

27.    Defendant Peter J. Kinver ("Kinver") served as the Chief Operating Officer ("COO") and Executive Vice President of Barrick from January 1, 2004 to May 2, 2012.  He joined Barrick as Executive Vice President, Operations, on September 9, 2003.  Kinver made false and/or misleading statements as alleged herein, and is also liable as a control person for the false and misleading statements alleged herein.

28.    Defendant Igor Gonzales ("Gonzales") replaced Kinver as Barrick's COO, and served in that role until the second quarter of 2013.  Prior to becoming COO, Gonzales served as president of Barrick's South America region.  He first joined Barrick in 1998.  Gonzales made false and/or misleading statements as alleged herein, and is also liable as a control person for the false and misleading statements alleged herein.

29.    Defendant George Potter ("Potter") served as Senior Vice President, Capital Projects, of Barrick Gold from 2008 until his retirement.  Potter joined Barrick as Vice President, Capital Projects in 2004.  Potter made false and/or misleading statements as alleged herein, and is also liable as a control person for the false and misleading statements alleged herein.

30.    Defendant Sybil E. Veenman ("Veenman") served as Senior Vice President and General Counsel of Barrick from June 2010, and left the Company in 2014.  Veenman signed and filed false and misleading SEC filings and Company statements.  Specifically, Veenman

signed and filed:  (1) the October 29, 2010 Form 6-K attaching Barrick's Third Quarter Report for 2010;  (2) the February 18, 2011 Form 6-K attaching Barrick's Fourth Quarter and Year-End Report for 2010; (3) the March 31, 2011 Form 40-F attaching Barrick's Annual Report for 2010; (4) the April 28, 2011 Form 6-K attaching Barrick's First Quarter Report for 2011; (5) the July 29, 2011 Form 6-K attaching Barrick's Second Quarter Report for 2011; (6) the February 2, 2012 Form 6-K attaching Barrick's Fourth Quarter Report for 2011; (7) the March 28, 2012 Form 40-F attaching Barrick's Annual Report for 2011; (8) the May 3, 2012 Form 6-K attaching Barrick's First Quarter Report for 2012; (9) the July 27, 2012 Form 6-K attaching Barrick's Second Quarter Report for 2012; (10) the November 2, 2012 Form 6-K attaching Barrick's Third Quarter Report for 2012; (11) the February 15, 2013 Form 6-K attaching Barrick's Fourth Quarter and Year-End Report for 2012; (12) the March 28, 2013 Form 40-F attaching Barrick's Annual Report for 2012; and (13) the April 25, 2013 Form 6-K attaching Barrick's First Quarter Report for 2013.  Veenam is liable as a control person for the false and misleading statements alleged herein.

## FACTUAL ALLEGATIONS

### I.  Barrick Gold Corporation and the Pascua-Lama Project

31.    Barrick started its gold mining business in 1983.  By 2006, following a series of acquisitions, Barrick had grown into the largest gold mining company in the world.

32.    Barrick's business model with respect to its gold mining business involves exploration, mining, production and sales.  Through the process of exploration and prospecting, Barrick identifies and acquires gold ore deposits.  Barrick then develops the areas around the gold ore deposits to mine the gold.  Once a mine is constructed, Barrick begins producing gold.  Barrick sells the gold bullion that it produces in the gold spot market, and sells the gold

concentrate it produces to independent smelting companies.  Those sales generate billions of dollars in annual revenue for Barrick.

33.     In 2009, Barrick faced declining production levels from its existing mines.  This decline in production, in turn, threatened Barrick's future earnings.

34.     To allay investor concerns about its decline in gold production, Barrick's management touted the Company's development of a "new generation of low cost mines" that would produce millions of ounces of gold per year "at lower cash costs than the current [Barrick] profile."

35.     The most significant of these new mines was a bi-national gold, silver and copper mining project in the Andes Mountains, named "Pascua-Lama."

36.     Approximately 75% of the ore at Pascua-Lama is located in Chile, and 25% is located in Argentina.

37.     Barrick acquired the rights to the Chilean side of Pascua-Lama through its acquisition of Lac Minerals Ltd. in 1994.

38.     Barrick acquired the Argentinian side of Pascua-Lama through certain mining concessions in 1995 and through its acquisition of Exploraciones Mineras Argentinas S.A. in 1997.

39.     Chile and Argentina entered into a bilateral treaty in order for Barrick to be able to mine Pascua-Lama.

40.     Pascua-Lama was a cornerstone of Barrick's business, whose successful development was critical to Barrick's future.  According to the *New York Times,* in a 2004 Canadian regulatory filing Barrick disclosed that Pascua-Lama represented "approximately 25 percent of Barrick's worldwide gold reserves."

41.     In May 2009, Barrick announced that it was moving forward with construction of the Pascua-Lama mine.  During Barrick's earnings call for the second quarter of 2009, CEO Regent highlighted the importance of Pascua-Lama to Barrick and its shareholders:

> The construction decision on Pascua-Lama announced here in early May is a *milestone event for Barrick* and is a combination of a three pronged approach involving a receipt of key construction permits and satisfactory resolution on cross [border] and fiscal matters and a financing strategy that is well advanced.
>
> Pascua-Lama is *a world class deposit* on the border of Chile and Argentina prudent and probable gold reserves are about 18 million ounces with an additional 4.7 million ounces in measured in indicated resources and contain silver within gold reserves of about 718 million ounces. *This is a low cost long life project which is expected to have a significant impact on our future production, cash cost, cash flow and earnings.* As we have mentioned previously, if Pascua-Lama was in production today it would have the [e]ffect of reducing Barrick's overall of total cash cost by about $40 per ounce.
>
> Average annual production in the first four, five years is expected to be 750 to 800,000 ounces of gold and 35 million ounces of silver at a total cash cost of 20 to $50 per ounce, making it *one of the lowest cost gold mines in the world*.
>
> . . .
>
> . . . .   Pascua-Lama has strong government support from both countries at the local, regional and national levels.[1]

42.     Indeed, the importance of Pascua-Lama to Barrick is demonstrated by the amount of capital Barrick poured into the project.  In 2010, Barrick spent $724 million on Pascua-Lama, the most it spent on any single project.  In 2011, Barrick spent almost $1.2 billion on Pascua-Lama, while spending only $713 on other project capital expenditures.  In 2012, Barrick again increased its capital investment in Pascua-Lama, spending approximately $1.8 billion, which constituted almost 75% of Barrick's total project capital expenditures for the year.

---

[1]     Unless otherwise noted, all bold and italic *emphasis* in quotations has been added throughout.

## II.   The Environmental Challenges of Mining at Pascua-Lama

43.    Pascua-Lama is located high in the Andes Mountains at approximately 15,000 feet above sea level.   The terrain is harsh, the air is thin, and the climate is inhospitable during the winter months.  As such, Barrick faced multiple hurdles in attempting to turn Pascua-Lama from an untapped gold ore deposit to a fully functioning gold-producing mine.   Barrick represented to investors that it had the resources and expertise necessary to overcome these hurdles.

44.    Because of its high altitude, prior to Barrick's exploration and prospecting of Pascua-Lama, the area was relatively untouched by humans.  The valleys below Pascua-Lama, on the other hand, are inhabited by tens of thousands of people.  These inhabitants rely on runoff from the highlands for drinking water and irrigation.  Local farmers use this water to help grow grapes and other fruits that they export globally.

45.    Much of the runoff water comes from environmentally-sensitive glaciers located on the mountains.  The glaciers capture snow in the winter and release water slowly down the mountains over the spring and summer months.

46.    If not properly controlled, mining activities can have a damaging impact on glaciers.  If mining activities are not properly controlled, the surrounding glaciers can end up covered in dust.  When glaciers that naturally reflect sunlight become covered in opaque dust, the ice absorbs more heat and melts more quickly.  These same dust emissions can contain toxic elements that pollute the water that is released from the glaciers to the valleys below.

47.    Moreover, the process by which a mining company extracts gold from an open pit can also harm the environment.  Mining companies use cyanide to extract gold from crushed ore. Cyanide is poisonous to animals and humans.

48.     Furthermore, the rock crushing process used in mining creates sulfuric acid. Mining companies must take great care to make sure this "acid rock drainage" from the rock crushing process does not enter the surrounding water system.

49.     Thus, in addition to the logistical hurdles of mining for gold at 15,000 feet above sea level, Barrick also had to make sure that it conducted its mining operations at Pascua-Lama in such a manner so as to avoid disturbing the sensitive ecosystem and without causing harm to the environment and to downstream residents.

50.     Because of the environmental risks presented by mining at Pascua-Lama, Barrick encountered significant resistance from local civic and environmental groups who opposed Barrick's plans to construct a mine at, and extract gold from, the previously untouched area. These groups were primarily concerned with the effect that mining would have on the glaciers and the water supply.

III.    **Barrick Obtains Permission from the Chilean and Argentine Governments to Mine at Pascua-Lama by Agreeing to Comply with Strict Requirements for the Protection of the Environment**

51.     To combat its critics' environmental concerns, Barrick drew up comprehensive "Environment Impact Assessments," or "EIAs," for the approval of the Chilean and Argentine authorities prior to beginning mining activities at Pascua-Lama.   The EIAs contained requirements with which Barrick agreed to comply to avoid causing harm to the environment and water supply.

52.     Barrick first submitted EIAs to the Chilean and the Argentine authorities in 2000.

53.     Initially, Barrick proposed breaking up three glaciers near the mine site and removing the ice and snow to a different location so that Barrick could mine without harming these important ice formations.

54.     Barrick's plans to blow up glaciers with dynamite in order to relocate them caused a huge backlash from local residents and environmental groups.  In response to these protests, Barrick abandoned this "glacier relocation plan," and agreed to leave the glaciers in place and instead follow very strict environmental regulations to avoid damaging those ice bodies.

55.     In December 2004, Barrick submitted a modified EIA to the Chilean authorities. In response to questions and concerns raised by the local communities and Chilean authorities, Barrick submitted several addenda to the modified EIA.

56.     Barrick finally received approval from Chilean environmental regulatory authorities to proceed with mining under the modified EIA in February 2006.  The modified EIA contained *more than 400 environmental conditions* with which Barrick agreed to comply. Indeed, Barrick's compliance with the conditions set forth in the modified EIA was essential to its ability to proceed with mining activities at Pascua-Lama.

57.     Barrick modified its Argentine EIA in November 2004 to address the cumulative impact that Pascua-Lama and another Barrick mine in Argentina, Veladero, would have on the Argentine side of the border.  The modified EIA was approved by the Argentine authorities in December 2006.

58.     The Chilean and Argentine modified EIAs contained important safeguards to protect the environment.  Many of these were focused on the preservation of the glaciers and protecting the quality of the water supply.

59.     For example, Barrick was required to implement several dust control measures to limit the amount of dust its mining activities would emit into the atmosphere, onto glaciers, and into the water supply.  Barrick agreed to keep its access roads wet and to restrict the number of

trucks traveling on those access roads to limit the amount of dust that would be blown into the air. These dust control measures were essential to protect air quality, prevent water contamination, and to prohibit premature melting of the glaciers.

60. Barrick also agreed to construct a water management system to protect the water supply flowing into the valleys. The water management system was meant to include a series of diversion canals and sedimentation pools to ensure that the water flowing down the mountains would be diverted around the mine area and, therefore, not contaminated with cyanide and sulfuric acid. Any water that did come into contact with the mine was to be treated before being sent back down the mountain to prevent acid rock drainage entering the water supply.

61. The water management system was also meant to include dozens of monitoring points to detect any acid or other toxic substances in the water.

## IV. Barrick Reassures Investors about Its Purported Compliance with Environmental Obligations

62. In light of vigorous environmental opposition to its Pascua-Lama project, Barrick went to great lengths to tout to its investors its environmental compliance and controls. Barrick's statements about its environmental compliance were of great significance to investors, who knew that the success of Pascua-Lama was dependent on Barrick's environmental compliance.

63. Every year, Barrick released its "Responsibility Report," which, among other things, set forth Barrick's purported commitment to "protecting the environment." Barrick typically released its Responsibility Report on its website a few months after the end of the calendar year to which the Responsibility Report applied. Barrick specifically informed investors that they should rely on the statements set forth in its Responsibility Report:

> Our annual Responsibility Report, based on the [Global Reporting Initiative's] framework and Mining & Metals Supplement, provides information on Barrick's management of significant issues affecting our license to operate, including environmental,

workplace and social issues. It can be used by us, and by our stakeholders, to benchmark our performance against others in our industry.

64.     In its Responsibility Report for the 2010 calendar year, released on Barrick's website in 2011, Barrick stated:

> We are governed in our environmental management by our corporate Environmental Policy. The Policy outlines our **commitment to pollution prevention, safeguarding the environment**, **educating our employees and communities about our environmental commitments, and applying proven management practices to prevent or mitigate negative environmental impacts**. Performance indicators help us measure how well we are performing.
>
> Application of the Environmental Management System (EMS) Standard at each of our operations helps us realize these policy commitments The EMS Standard applies to Barrick activities at all properties, including joint ventures where we are the operator. It consists of 16 elements. Each element contains a statement of the standard of environmental conduct that Barrick expects, followed by a list of Management System Requirements. The Requirements represent the specific systems, practices, procedures or tasks that are, at a minimum, necessary to meet the Standard.
>
> Once completely installed, the EMS provides the threshold for an operation to move to ISO 14001 registration. Barrick's South American mines are all ISO 14001 registered and several other operations in various regions are currently pursuing registration. Our goal is to register all operating sites by the end of 2011.
>
> **We conduct environmental audits to verify that management systems are adequate to ensure performance commitments are achieved and that our operations are in compliance with government regulations and internal standards**. When audits identify deficiencies, our investigations attempt to recognize the fundamental causes underlying these deficiencies so that effective corrective and preventative actions can be implemented.

65.     Barrick repeated these statements concerning its purported commitment to the environment in substantially the same form in its "Responsibility Report" for the year 2011.

-16-

66.     Barrick also emphasized the involvement of its Board and senior management in its environmental compliance efforts.  First, the Board had an "Environmental, Health and Safety (EHS) Committee," which was later renamed the "Corporate Responsibility Committee."  This Board committee was "responsible for reviewing Barrick's environmental, safety and health, and corporate social responsibility (CSR) policies and programs; including overseeing performance, monitoring current and future regulatory issues, and making recommendations to the Board, where appropriate, on significant matters in respect of environmental, safety, health and CSR." Two members of Barrick's executive management team sat on this Board committee.

67.     Second, Barrick's CEO, COO and its "most senior executives" sat on an "Executive Community, Environmental, Health, Safety, and Security (CHESS) Committee." According to Barrick, the purpose of this management committee was to "review[] performance, trends, and issues[,] and approve[] CHESS policies and business plans."

68.     Thus, in addition to promising to comply with the conditions set forth in the EIAs approved by Chilean and Argentine authorities after an extensive review and revision process, Barrick sought to alleviate concerns about the environmental impact of its activities at Pascua-Lama by (1) highlighting its environmental compliance procedures and (2) emphasizing management's and the Board's active role in overseeing its compliance.

69.     As the Pascua-Lama project progressed, Barrick executives assured investors that its mining activities in Chile and Argentina complied with Barrick's environmental obligations.

70.     For example, in its third quarter report for 2010, released on October 28, 2010, and filed with the SEC on Form 6-K on October 29, 2010, Barrick addressed Argentina's new glacier protection law.  Speaking to its activities at Pascua-Lama, Barrick stated:

> ***Our activities*** do not take place on glaciers, and ***are undertaken pursuant to existing environmental approvals issued on the basis***

> *of comprehensive environmental impact studies* that fully
> considered potential impacts on water resources, glaciers and other
> sensitive environmental areas around Veladero and Pascua-Lama.
> We have a comprehensive range of measures in place to protect
> such areas and resources.

71.     Barrick repeated this statement in subsequent periodic reports filed with the SEC throughout the relevant period.

72.     On an earnings call with analysts and investors on October 28, 2010, CEO Regent stated:

> Barrick has always been supportive of legislation and measures to
> protect glaciers and . . . *neither the Pascua-Lama project [n]or
> Veladero are impacting the glaciers surrounding our operations*.
> *We have completed comprehensive environmental impact studies
> that have been extensively reviewed and approved by the
> authorities on both the Chilean and Argentinian side of the
> border*.

73.     Barrick also reassured stock analysts covering the Company that it was in compliance with environmental regulations at Pascua-Lama.  On February 18, 2011, Michael Dudas of Jefferies & Company, Inc. relayed to investors that, "[a]t Pascua Lama, Barrick *management believes it is fully compliant with the permits and provincial legislation, including legislation for glacier protection*."

74.     On December 14, 2011, Barrick issued a special statement in response to concerns raised by an environmental group.  Barrick adamantly denied any environmental infractions at Pascua-Lama, and laid out its purported compliance at great length:

> *Barrick is committed to carrying out its activities around the
> world according to high environmental, operational and social
> standards*.  Barrick respects the law and applies its Responsible
> Mining approach in every country where it operates.
>
> . . . .  *Our professionals are focused on protecting all aspects of
> the environment*, in particular land, water (*including glaciers, as
> in the case of the Pascua-Lama project* and the Veladero mine),

air and biodiversity.  Barrick has an award-winning track record of responsible environmental performance.

. . .

. . . .  *[T]he company has implemented a glacier monitoring program for the entire Pascua-Lama project area, along with additional requirements associated with glacier protection as mandated in the project's environmental approval by Chilean authorities after extensive public input*.

. . .

. . . .  *[T]he company put in place a range of measures to mitigate the potential dust impact of dust emissions on glaciers*.  All of those measures have been incorporated into the project's Environmental Impact Assessment (EIA), which was approved by environmental authorities.  During the EIA revision process, it was determined that the Pascua Lama project will not generate damaging dust accumulation in areas where glaciers are present.  The project will put in place a set of dust abatement and control measures such as road watering and proper road planning.

75.    Barrick continued to issue environmental insurances to investors well into 2013.  On an April 24, 2013 earnings call, CEO Sokalsky told investors that Barrick's activities at Pascua-Lama had "*no adverse impact on water quality or glaciers*."

## V.    Barrick's Reporting Obligations

### A.    Barrick Is Required To Report Its Financial Results in Accordance with Generally Accepted Accounting Principles

76.    As a foreign issuer that lists its securities on the NYSE, Barrick is required to publicly file certain disclosure documents containing comprehensive information about its business operations and its financial condition.

77.    Investors rely on the accuracy and transparency of these disclosures when determining whether to invest.  Under SEC regulations, a foreign issuer may prepare its financial statements using United States Generally Accepted Accounting Principles ("U.S. GAAP"), or it

may use another comprehensive body of generally accepted accounting principles. If a foreign issuer elects to use the latter, it must provide a reconciliation of material terms to U.S. GAAP.

78.     A company's board of directors and management is responsible for preparing the financial statements in accordance with generally accepted accounting principles.

79.     Since 2011, Barrick has used the International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board ("IASB") to report its financial results to U.S. investors. Prior to 2011, Barrick reported its financial results using U.S. GAAP.

80.     Barrick expressly informed investors that its financial statements were prepared in accordance with generally accepted accounting principles, which include both IFRS and U.S. GAAP.

81.     For example, in its Third Quarter Report for 2010, Barrick told investors that the financial information presented therein had been "prepared under United States generally accepted accounting principles." Barrick made an identical statement in its Fourth Quarter Report for 2010.

82.     Similarly, in Barrick's 2010 Annual Report, CFO Sokalsky stated that, "[t]he accompanying consolidated financial statements have been prepared by and are the responsibility of the Board of Directors and Management of the Company," and that, "[t]he consolidated financial statements have been prepared in accordance with United States generally accepted accounting principles and reflect Management's best estimates and judgments based on currently available information."

83.     Both CEO Regent and CFO Sokalsky also provided certifications to the 2010 Annual Report representing that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

84.     After Barrick switched from U.S. GAAP to IFRS, effective January 1, 2011, Barrick represented that the financial information in its periodic reports were prepared in accordance with IFRS.

85.     For example, in its 2011 Annual Report, the first annual report in which Barrick applied IFRS, CFO Sokalsky represented that, "[t]he accompanying consolidated financial statements have been prepared by and are the responsibility of the Board of Directors and Management of the company," and that, "[t]he consolidated financial statements have been prepared in accordance with International Financial Reporting Standards and reflect Management's best estimates and judgments based on currently available information."

86.     CEO Regent and CFO Sokalsky again provided certifications with the 2011 Annual Report representing that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," and CEO Sokalsky and CFO Al-Joundi provided similar certifications with the 2012 Annual Report.

87.     During the relevant time period, Barrick listed Pascua-Lama on its balance sheet as a non-current asset under "Projects, Plant & Equipment," or "PP&E."   International Accounting Standard ("IAS") 16 provides that "[a]n item of property, plant and equipment that qualifies for recognition as an asset shall be measured at its cost."   Similarly, ASC 360 (a U.S. GAAP principle) provides that PP&E should be initially measured at cost.

88.     After recognizing Pascua-Lama as an asset, Barrick was required to list Pascua-Lama on its balance sheet at its cost "less any accumulated depreciation and any accumulated impairment losses."   This was the balance sheet "carrying amount" of Pascua-Lama.

89.     As with other items of PP&E, Barrick was required to test Pascua-Lama for impairment; that is, Barrick had to periodically compare the carrying amount of Pascua-Lama to

its recoverable amount.  If the recoverable amount of Pascua-Law was less than the carrying

amount, Barrick had to recognize an impairment loss/operating expense and reduce the carrying

amount to the recoverable amount.

90.     Indeed, Barrick expressly recognized in its regulatory filings with the SEC that it

had an obligation under U.S. GAAP and IFRS to test for impairment of PP&E.  For example, in

its 2010 Annual Report, Barrick stated:

> ***We review and test the carrying amounts of assets when events or***
> ***changes in circumstances suggest that the carrying amount may***
> ***not be recoverable***.  We group assets at the lowest level for which
> identifiable cash flows are largely independent of the cash flows of
> other assets and liabilities.  For operating mines, capital projects
> and petroleum and natural gas properties, the individual
> mine/project/property is a single reporting unit for impairment
> testing purposes.  A potential impairment is identified if the sum of
> the reporting unit's undiscounted cash flows is less than its
> carrying amount.  When a potential long-lived asset impairment is
> identified, the amount of impairment is calculated by comparing its
> fair value to its carrying amount.

91.     Barrick substantially repeated this statement in its 2011 and 2012 Annual Report,

which were purportedly issued in accordance with IFRS:

> ***Non-current assets are tested for impairment when events or***
> ***changes in circumstances suggest that the carrying amount may***
> ***not be recoverable***.  The recoverable amount is calculated using
> the [Fair Value Less Costs to Sell approach].  However, the
> assessment is done at the [cash generating unit] level, which is the
> lowest level for which identifiable cash flows are largely
> independent of the cash flows of other assets.

92.     Impairment testing under IFRS is governed by IAS 36.  Under IAS 36, a company

is required to "assess at the end of each reporting period whether there is any indication that an

asset may be impaired."  IAS 36 further provides that:

> In assessing whether there is any indication that an asset may be
> impaired, an entity shall consider, as a minimum, the following
> indications:

External sources of information

(a) during the period, an asset's market value has declined significantly more than would be expected as a result of the passage of time or normal use.

(b) significant changes with an adverse effect on the entity have taken place during the period, or will take place in the near future, in the technological, market, economic or legal environment in which the entity operates or in the market to which an asset is dedicated.

(c) market interest rates or other market rates of return on investments have increased during the period, and those increases are likely to affect the discount rate used in calculating an asset's value in use and decrease the asset's recoverable amount materially.

(d) the carrying amount of the net assets of the entity is more than its market capitalisation.

Internal sources of information

(e) evidence is available of obsolescence or physical damage of an asset.

(f) *significant changes with an adverse effect on the entity have taken place during the period, or are expected to take place in the near future, in the extent to which, or manner in which, an asset is used or is expected to be used*. These changes include the asset becoming idle, plans to discontinue or restructure the operation to which an asset belongs, plans to dispose of an asset before the previously expected date, and reassessing the useful life of an asset as finite rather than indefinite.

(g) *evidence is available from internal reporting that indicates that the economic performance of an asset is, or will be, worse than expected*.

93.    IAS 36 states that these factors are "not exhaustive." Indeed, "[a]n entity may identify other indications that an asset may be impaired and these would also require the entity to determine the asset's recoverable amount . . . ."

94.     Impairment testing is an important component of generally accepted accounting principles, including IFRS.   When a company recognizes an impairment loss, it must reduce the carrying amount of the affected asset.   The loss must also be recognized as an expense on the company's income statement, which results in a reduction of the company's reported net income and earnings per share.

95.     Correspondingly, when a company fails to properly recognize an impairment loss on an asset, the carrying value of that asset will be overstated, and the company's reported net income and earnings per share will be artificially inflated.

96.     By representing to investors that its financial reports were prepared in accordance with generally accepted accounting principles, including IFRS, Barrick telegraphed to the markets that its reporting of the carrying value, net income, and earnings per share attributable to Pascua-Lama were accurately reflected in the Company's financial statements.

**B.     Barrick Is Required to Maintain, and Certify to the Effectiveness of Its, Disclosure and Internal Controls**

97.     As a foreign issuer whose stock is registered with the SEC and sold on markets in the United States, Barrick also is required to maintain adequate internal controls and its top-ranking executives must personally guarantee the effectiveness of the Company's internal controls.

98.     The Committee of Sponsoring Organizations of the Treadway Commission's *Internal Control – Integrated Framework* (which Barrick purported to follow) defines internal control as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting and compliance."  With respect to the reporting and compliance aspects of this definition, the *Integrated Framework* specifically states that "[w]hen internal

control is determined to be effective, senior management and the board of directors have reasonable assurance [that] . . . the organization prepares reports in conformity with applicable laws, rules and regulations, and standards established by legislators, regulators, and standard setters, . . . [and that] the organization complies with applicable laws, rules and regulations." *See* The Committee of Sponsoring Organizations of the Treadway Commission's *Internal Control – Integrated Framework* § 3 ("Requirements for Effective Internal Control").

99.     Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX") requires Barrick to publish information in its annual reports concerning the scope and adequacy of its internal control structure and procedures for financial reporting, and also to assess the effectiveness of such internal controls and procedures.   In its interpretative guidance issued for the rules promulgated to implement Section 404, the SEC instructed that "management should evaluate whether it has implemented controls that adequately address the risk that a material misstatement of the financial statements would not be prevented or detected in a timely manner.   [This involves] a top-down, risk-based approach . . . , including the role of entity-level controls in assessing financial reporting risks and the adequacy of controls."   *Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934*, Exchange Act Release No. 55929, § I (June 20, 2007).    "When performing its evaluation of the risk characteristics of the controls identified, management should consider whether there are location-specific risks that might impact the risk that a control might fail to operate effectively. Additionally, there may be pervasive risk factors that exist at a location that cause all controls, or a majority of controls, at that location to be considered higher risk."   *Id.* § II.A.3.  When management identifies a control

deficiency, it cannot claim that its internal controls are effective if the control deficiency is deemed to be a material weakness.

100.     Section 302 of SOX requires Barrick's CEO and CFO to provide certifications concerning their review of, and disclosure of information about, the Company's internal controls. Specifically, pursuant to rules promulgated by the SEC to implement Section 302 of SOX, the CEO and CFO are required to certify in each annual report that:

- he or she has reviewed the report;

- based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report;

- based on his or her knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in the report;

- he or she and the other certifying officers:

    o are responsible for establishing and maintaining "disclosure controls and procedures" [*i.e.*, controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms] for the issuer;

    o have designed such disclosure controls and procedures to ensure that material information is made known to them, particularly during the period in which the periodic report is being prepared;

    o have evaluated the effectiveness of the issuer's disclosure controls and procedures as of a date within 90 days prior to the filing date of the report; and

   o have presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on the required evaluation as of that date;

  • he or she and the other certifying officers have disclosed to the issuer's auditors and to the audit committee of the board of directors (or persons fulfilling the equivalent function):

   o all significant deficiencies in the design or operation of internal controls (a pre-existing term relating to internal controls regarding financial reporting) which could adversely affect the issuer's ability to record, process, summarize and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

   o any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

  • he or she and the other certifying officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

*Certification of Disclosure in Companies' Quarterly and Annual Reports*, Exchange Act Release 46247, § II.A (Sept. 9, 2002) (footnotes omitted).

   101. Barrick's 2010 Annual Report thus contained numerous and substantial representations concerning the Company's disclosure controls and procedures and internal controls over financial reporting, and the purported effectiveness thereof. With respect to Barrick's disclosure controls and procedures, Barrick represented to investors:

   Disclosure controls and procedures are designed to ensure that material information relating to Barrick, and its consolidated subsidiaries, is accumulated and communicated on a timely basis to appropriate members of Barrick's management, including Barrick's Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure. Disclosure controls and procedures apply to various disclosures, including reports filed with securities regulatory agencies.

. . .

> An evaluation was carried out under the supervision of and with the participation of Barrick's management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures . . . at December 31, 2010. Based on that evaluation, Barrick's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures . . . were effective as at December 31, 2010.

102.    The 2010 Annual Report also contained a report by Barrick management on the Company's internal controls over financial reporting. Barrick assured investors:

> Barrick's Management is responsible for establishing and maintaining adequate internal control over financial reporting.
>
> Barrick's Management assessed the effectiveness of the Company's internal control over financial reporting as at December 31, 2010. Barrick's Management used the Committee of Sponsoring Organizations of the Treadway Commission (COSO) framework to evaluate the effectiveness of Barrick's internal control over financial reporting. Based on Barrick Management's assessment, Barrick's internal control over financial reporting is effective as at December 31, 2010.

103.    In the financial statements accompanying its 2010 Annual Report, CFO Sokalsky represented that, "[t]he Company has developed and maintains a system of internal accounting controls in order to ensure, on a reasonable and cost effective basis, the reliability of its financial information."

104.    Finally, both CEO Regent and CFO Sokalsky provided certifications to Barrick's 2010 Annual Report concerning Barrick's implementation, review, and satisfaction with the effectiveness of its disclosure controls and procedures and its internal controls over financial reporting:

105.    Regent and Sokalsky each certified:

> 1. I have reviewed this annual report on Form 40-F of Barrick Gold Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4.   [Barrick]'s other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the issuer and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the issuer's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting; and

5. The issuer's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the issuer's auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting.

106.    Similarly, in Barrick's 2011 Annual Report, Barrick made additional comprehensive disclosures about its disclosure controls and procedures and its internal controls over financial reporting.  Barrick stated:

Management is responsible for establishing and maintaining adequate internal control over financial reporting and disclosure controls and procedures.  Internal control over financial reporting is a framework designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with International Financial Reporting Standards.  The Company's internal control over financial reporting framework includes those policies and procedures that pertain to the preparation of financial information, including information contained in Barrick's 2011 Annual Report and this Annual Information Form.

Disclosure controls and procedures form a broader framework designed to ensure that other financial and non-financial information disclosed publicly fairly presents in all material respects the financial condition, results of operations and cash flows of the company for the periods presented in the MD&A and Barrick's Annual Report.  Barrick's disclosure controls and procedures framework includes processes designed to ensure that material information relating to Barrick, and its consolidated subsidiaries, is made known to management, including Barrick's Chief Executive Officer and Chief Financial Officer, by others within those entities to allow timely decisions regarding required disclosure.  Disclosure controls and procedures apply to various

disclosures, including reports filed with securities regulatory agencies.

The management of Barrick, at the direction of our chief executive and financial officers, have evaluated the effectiveness of the design and operation of the internal controls over financial reporting (as defined in rules adopted by the SEC) and disclosure controls and procedures as at December 31, 2011. Based on that evaluation, Barrick's Chief Executive Officer and Chief Financial Officer concluded that the Company's internal control over financial reporting and disclosure controls and procedures were effective as at December 31, 2011.

107.    Like the 2010 Annual Report, Barrick's 2011 Annual Report also included a report by Barrick management on the Company's internal controls over financial reporting, CFO Sokalsky's representation about Barrick's accounting controls, and the certifications from Regent and Sokalsky required under SOX.

108.    Barrick's 2012 Annual Report contained substantially identical misrepresentations and false certifications by Barrick, Sokalsky and Al-Joundi concerning the effectiveness of Barrick's internal controls over financial reporting and disclosure controls and procedures as of December 31, 2012.   Barrick's 2012 Annual Report included a report by Barrick management on the Company's internal controls over financial reporting, CFO Al-Joundi's representation about Barrick's accounting controls, and the certifications from Sokalsky and Al-Joundi required under SOX.

109.    Barrick made similar statements about its disclosure controls and procedures and its internal controls over financial reporting in its quarterly reports filed on Form 6-K.   For example, in its 2011 Second Quarter Report, Barrick stated:

Management is responsible for establishing and maintaining adequate internal control over financial reporting and disclosure controls and procedures.

Internal control over financial reporting is a framework designed to provide reasonable assurance regarding the reliability of financial

reporting and the preparation of financial statements in accordance with IFRS. The Company's internal control over financial reporting framework includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with IFRS, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the Company's consolidated financial statements.

Disclosure controls and procedures form a broader framework designed to ensure that other financial information disclosed publicly fairly presents in all material respects the financial condition, results of operations and cash flows of the company for the periods presented in this Report.  The Company's disclosure controls and procedures framework includes processes designed to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to management by others within those entities to allow timely decisions regarding required disclosure.

Together, the internal control over financial reporting and disclosure controls and procedures frameworks provide internal control over financial reporting and disclosure.

110. By making these myriad representations about the effectiveness of its disclosure controls and procedures and its internal controls over financial reporting, Barrick assured investors that it had the infrastructure and safeguards in place to ensure that financial information regarding Pascua-Lama would be accurately reported and that any other material facts concerning the Pascua-Lama project would be publicly disclosed, including those facts related to impairment.

## VI.   Unbeknownst to Investors, Barrick Consistently Violates the Environmental Regulations Governing Pascua-Lama

111.   Despite its representations to the contrary, Barrick failed to comply with many of the important environmental conditions imposed on it at Pascua-Lama.  This caused dire problems for the Company, and rendered materially misleading the Company's statements concerning its environmental compliance, its financial results, and its internal controls.

112.   Barrick's numerous and substantial environmental infractions at Pascua-Lama are documented in resolutions issued by the Environmental Commission of the Atacama Region of Chile imposing sanctions on Barrick's operating subsidiary in Chile, Compañia Minera Nevada SpA, which, while sent to senior Barrick executives, were unknown to the market and investors.

113.   The Chilean government sent notice of these decisions to Barrick's top lawyer in Chile, José Antonio Urrutia Riesco, who identified himself to Chilean authorities in sworn testimony as "a Deputy Director of Barrick Chile."  However, Barrick never publicly disclosed the multiple environmental infractions it was committing, and the fines and sanctions that were being imposed on it.  Instead, Barrick continued to insist that it was in compliance with the EIAs.

114.   Barrick's environmental infractions commenced not long after the modified EIA was approved by the Chilean authorities.

115.   The Chilean authorities conducted an inspection of the Pascua-Lama site on or about January 18, 2007.  During that inspection, the authorities found that Barrick had improperly enlarged a road, causing rocks and dirt from the side of the mountain to fall and block several canals because Barrick had failed to construct walls to contain the falling material. Because Barrick was at fault for the environmental damage and failed to notify the Chilean authorities of the violation, Barrick was deemed to have violated the modified EIA and was fined by the government.

116.     The Chilean authorities conducted another inspection of Pascua-Lama on or about November 26, 2009.   During that inspection, the authorities discovered that Barrick was violating the modified EIA by not following measures to prevent the emission of dirt and dust during its construction activities.   Specifically, the Chilean authorities noted that Barrick did not wet the roads on dry days and did not otherwise treat the roads to prevent dust from rising, all of which increased the dust on the surface of glaciers.   Furthermore, the Chilean authorities found that Barrick had extracted water from an unauthorized location.   Although Barrick presented a series of technical excuses to the Chilean authorities for the violations (such as claiming that environmental restrictions applied only during the operations stage of the mining, and not during the construction phase), the Chilean authorities rejected these excuses and in February 2011 imposed another monetary fine on Barrick for its violation of the modified EIA.

117.     This violation, which is recorded in resolutions issued by the Chilean authorities, is corroborated by a confidential witness referred to in the class complaint.   *In re Barrick Gold Securities Litigation*, 1:13-cv-03851-SAS, Docket No. 50.   The class complaint alleges that, according to a former Pascua-Lama project manager who worked at Barrick between April 2010 and June 2011, Barrick did not have enough water to wet the roads and ultimately refused to purchase a compound that could serve as a substitute for putting water on the roads to prevent the emission of dust because the compound was too expensive.

118.     Barrick also violated the provisions of the modified EIA setting forth how many trucks could drive into and out of the mine per day.   In August 2011, forty-three Barrick trucks were observed passing through the town of Alto del Carmen.   The modified EIA, however, limited Barrick from driving more than twenty trucks per day in order to protect the environment.   For its violation of the modified EIA, Barrick was again fined.

119.    Barrick's senior management was well aware that the company was violating the modified EIA's limit on the number of trucks traveling to and from the mine.  Beginning in July 2011, internal "Project Monthly Progress Reports" for Pascua-Lama were circulated at Barrick.  These reports apparently were circulated internally to Barrick's headquarters in Toronto, including to Defendants Kinver and Gonzales.   The July 2011 report highlighted the impermissible truck traffic as one of the "issues" with respect to the Chilean side of Pascua-Lama:  "**Vehicular flow through Convoys**:  company records show deviations from the [EIA] commitment.  We need to adjust the flows, the number of vehicles per convoy and flow rates while using the routes through the valley of San Felix."  This same "issue[]" was repeated in the September 2011 report, but was not disclosed to investors.

120.    The Chilean authorities conducted another inspection of Pascua-Lama on or about November 15, 2011.  The inspection found that Barrick was continuing to violate the modified EIA by, among other things, failing to provide a record of the number and types of transportation being used to access Pascua-Lama, failing to submit details of Barrick's efforts to keep the road wet to mitigate dust emissions, improperly storing and disposing of chemicals and other industrial waste, and inadequately maintaining a water treatment plant.

121.    The Chilean authorities conducted another site inspection of Pascua-Lama on March 28, 2012, and found more serious violations of the modified EIA.  Specifically, the authorities found that Barrick's dust emission mitigation efforts were woefully deficient.  Barrick had failed to wet the roads along which its trucks were driving, and had failed to cover the trucks carrying debris from the mining site.  As a result, the Chilean authorities observed that ***two glaciers at Pascua-Lama were covered by several centimeters of dust***.  Thus, Barrick was

causing the kind of environmental harm that the authorities, local residents and environmental groups had most feared, and that Barrick had agreed to take extensive measures to prevent.

122.   Moreover, the Chilean authorities discovered that Barrick had failed to properly implement its glacier monitoring plan.  The glacier monitoring plan was a requirement of the modified EIA designed to make sure that Barrick was properly measuring the impact of its mining activities on the surrounding glaciers.  The March 28, 2012 site inspection found that the glacier monitoring reports submitted by Barrick included errors and omissions, and were not being timely submitted to the authorities.  Indeed, there was once a five-month gap between glacier monitoring reports submitted by Barrick.

123.   Barrick senior management was well aware of its violations with respect to the glacier monitoring plan prior to the site inspection on March 28, 2012.  In its July 2011 Pascua-Lama Project Monthly Project Report, Barrick identified the need to update the glacier monitoring plan as one of the "main issues concerning" Pascua-Lama:  "This plan should be improved so that [Barrick's] activities may be performed continuously and without risk . . . ."  Thus, Barrick knew that the shortcomings in its glacier monitoring plan put the entire project in jeopardy.  If Barrick failed to properly implement the glacier monitoring plan in accordance with the requirements of the modified EIA, it ran the risk that Chilean authorities would shut Pascua-Lama down.  Yet, several months later, when the authorities conducted their site inspection, Barrick still had not properly addressed this serious problem.

124.   In response to resolutions recommending sanctions against Barrick for its violations of the modified EIA, Barrick attempted to make several excuses to the Chilean authorities.  Among its defenses, Barrick told authorities that it was having trouble complying with the conditions of the modified EIA because of the harsh climate and weather conditions at

Pascua-Lama.  The Chilean authorities rejected this excuse because the conditions at Pascua-Lama were well known to Barrick prior to agreeing to comply with the requirements of the modified EIA.

125.    As result of these numerous EIA infractions by Barrick, the Chilean authorities imposed their largest fines to date on Barrick.

126.    The fines imposed on Barrick for its environmental infractions were in the form of "UTM," or monthly tax units, a regulatory metric set by the Chilean government.  Between 2007 and 2013, one UTM ranged from between approximately 32,000 and 40,000 Chilean pesos.

127.    The fines imposed on Barrick by the Environmental Commission of the Atacama Region of Chile for violations of the modified EIA were as follows:

- Resolution 85, dated April 27, 2007:  300 UTM.

- Resolution 22, dated February 1, 2011:  300 UTM.

- Resolution 65, dated March 19, 2012:  300 UTM.

- Resolution 47, dated February 23, 2013:  500 UTM.

- Resolution 46, dated February 23, 2013:  2,550 UTM.

- Resolution 87, dated April 5, 2013:  1000 UTM.

128.    Thus, between February 2007 and April 2013, the Chilean authorities issued several resolutions detailing numerous and significant violations of the modified EIA by Barrick. These resolutions found that Barrick was completely disregarding the important environmental safeguards with which it had agreed to comply to protect the glaciers, air quality, and water supply at Pascua-Lama.   As detailed in the Pascua-Lama Project Monthly Progress Reports and in the resolutions themselves, Barrick's most senior executives in Chile and Toronto were aware of these infractions and their negative impact on the continuing viability of the project, yet they simply ignored them rather than taking remedial measures.

129.    The environmental infractions listed in the Chilean resolutions were not Barrick's only violation of the modified EIA.  In addition, Barrick failed to comply with the modified EIA's requirements for a proper water management system.

130.    As noted above, in the modified EIA Barrick agreed to construct a series of diversion canals and sedimentation pools to ensure that the water flowing down the mountains would be diverted around the mine area and, therefore, not contaminated with cyanide and sulfuric acid.

131.    A properly implemented water management system was integral to the success of Pascua-Lama.  Without it, Barrick could not commence its "pre-stripping" activities at the mine.

132.    However, rather than construct a water management system that complied with the requirements of the modified EIA, Barrick elected to design a non-conforming system in order to save costs.   Indeed, this is corroborated by a witness referred to in the class complaint, who explained that the water management system plans were changed by Barrick in the first quarter of 2011, without government knowledge or approval, in an attempt to cut costs by 35%.

133.    Barrick's non-compliance with the modified EIA's requirements for the water management system was discussed at a meeting of Barrick employees in La Serena, Chile on March 7, 2012.

134.    An internal Barrick presentation from that meeting reveals the Company's concern with its decision to deviate from the modified EIA.  The presentation noted that "[s]ystem approval [had been] refused by authorities due [to] an inconsistent design[]"  The presentation summarized the impact of the non-conforming water management system as follows:  "Each month delayed in delivery of [water management system] will impact the first

-38-

gold production directly."  The presentation went on:  "Not complying with First Gold in June 2013 will impact . . . financial and market results[.]"

135.    The non-conforming water management system was also identified in the Pascua-Lama Project Monthly Progress Reports presented to senior management in July 2011, September 2011, and January 2012.  These reports stated:

> ***Risk of not meeting the commitment to have the water management system fully operational*** before the start of prestripping:  ***This is a key commitment emphatically stated in the project's environmental approval***.  The Authority polls indicate that there is no possibility of postponing its execution.  If it begins to overload and sterile removal of the mine, ***the project will be in grave danger of being paralyzed***.  In order to avoid this, [it] is essential to complete construction of the system components and simultaneously collect or generate the information necessary to obtain timely authorization to operate.

136.    Barrick's violations of its environmental obligations at Pascua-Lama were not limited to the Chilean side of the project.  In its Pascua-Lama Project Monthly Progress Reports presented to senior management in July and September 2011, Barrick stated that it was in violation of the Argentine EIA's requirement that Barrick divert sedimentation from major earthworks, and Barrick was at risk of being penalized for this infraction.

137.    The pervasive environmental infractions described above were known to, or recklessly disregarded by, Barrick's senior management, including the Individual Defendants. As noted above, the Pascua-Lama Project Monthly Project Reports detailing the modified EIA violations were reportedly circulated to Defendants Kinver and Gonzales in Toronto.  Moreover, the Chilean resolutions imposing sanctions on Barrick were sent to Barrick's top legal official in Chile.  Finally, Barrick executives made several site visits to Pascua-Lama, where they could observe Barrick's environmental violations themselves.   For example, on July 26, 2012, Defendant Sokalsky told investors that Defendant Gonzales and he, among others, had traveled

to Pascua-Lama and met with the project management team.  Sokalsky continued:  "This was my second visit to the site in a couple of months, and I'm sure it will be a regular destination for me and our team going forward."

138.    On April 10, 2013, Barrick issued a press release stating that a Chilean appeals court had issued a preliminary injunction halting work, pending a full hearing, at Pascua-Lama on the Chilean side of the project.  Later in the day, Barrick issued an updated press release stating that it was "suspending construction work on the Chilean side of the Pascua-Lama project while working to address environmental and other regulatory requirements to the satisfaction of Chilean authorities," but that it was "too early to assess the impact, *if any*, on the overall capital budget and schedule of the project."

139.    After this announcement, which suggested that any problems at Pascua-Lama were not significant enough to derail or even delay the project, some stock analysts raised their recommendation for Barrick to "buy."  For example, Mackie Research Capital analyst Barry Allan estimated that Pascua-Lama would only be delayed for approximately 18 months as a result of the injunction.  According to *Bloomberg*, Macquarie predicted a "low likelihood of cancellation."  And Barrick itself subsequently told investors during an April 24, 2014 earnings calls that its activities at Pascua-Lama had "***no adverse impact on water quality or glaciers***."

## VII.    Internal Barrick Documents Identify Concerns with Barrick's Disclosure Procedures and Internal Controls

140.    Despite its public representations to the contrary, Barrick lacked adequate disclosure procedures and internal controls.

141.    Barrick's disclosure procedures and internal controls were insufficient to ensure that its public reporting fairly presented investors with a materially accurate and complete picture

of its financial condition and its results of operations, and to make sure that material information Barrick was required to disclose was actually disclosed to investors.

142.   Among other things, Barrick's monthly reports concerning Pascua-Lama contained "inaccuracies, omissions and inconsistencies," which resulted in material information being withheld from the public.  Barrick also had significant weaknesses in its risk management process at Pascua-Lama that led to inaccurate reporting by Barrick.  Furthermore, Barrick failed to fully establish a project management framework and to complete and update program plans at Pascua-Lama, which facilitated its repeated violations of the modified EIA despite its public representations to the contrary.

143.   Barrick itself expressly recognized these shortcomings in its Pascua-Lama Project Monthly Progress Reports.

144.   In April 2011, Barrick conducted a project audit report of Pascua-Lama.  The audit found the following significant control deficiencies:

- "Significant inaccuracies, omissions and inconsistencies in monthly reports";

- "Program Management Framework not fully established at outset of project";

- "Cost Management Process weaknesses & inaccurate reporting";

- "Program plans incomplete";

- "Program plans not consistently updated"; and

- "Risk Management Process weaknesses contributing to inaccurate reporting."

145.   These significant control deficiencies were repeated in the Company's Pascua-Lama Project Monthly Progress Reports in July 2011, September 2011, and January 2012.

146.     Through their receipt of the Monthly Project Reports highlighting these failures, Barrick's senior management knew, or recklessly disregarded, that there were significant deficiencies in the Company's project reporting, cost management, program planning, and risk management at Pascua-Lama that compromised Barrick's ability to accurately report financial data related to Pascua-Lama at the Company level, including the project costs, budgeting, and the anticipated completion date for the project, and also impeded Barrick's disclosure procedures and controls with respect to material information about Pascua-Lama.

147.     Because Pascua-Lama was such a major project for Barrick, these control deficiencies constituted material weaknesses in the Company's disclosure controls and procedures and internal controls over financial reporting.

## VIII.   <u>Barrick Fails to Properly Record an Impairment Loss for Pascua-Lama</u>

148.     As noted above, Barrick continuously failed to comply with the conditions of the modified EIAs governing Pascua-Lama.  As Barrick's violations grew more serious and the fines imposed by the Chilean authorities multiplied, the likelihood of Pascua-Lama meeting its production expectations diminished.

149.     Barrick senior management was aware of these problems by – at the very latest – mid-2011, when they received the July 2011 Pascua-Lama Project Monthly Progress Report. That report detailed numerous violations of the modified EIA, including the limitations on the number of vehicles traveling to and from the mine, the requirements for the glacier monitoring plan, and the need for a conforming water management system.

150.     In addition to the violations of the modified EIA, the July 2011 Pascua-Lama Project Monthly Progress Report revealed severe deficiencies at Pascua-Lama with respect to project reporting, cost management, program planning, and risk management.  These internal control failures placed the project in jeopardy of failing.

151.    In light of this information, Barrick senior management should have recorded an impairment loss against Pascua-Lama's carrying value.  However, they failed to do so, which rendered Barrick's financial statements materially false and misleading.

## IX.    Barrick Makes a Series of Partial but Inadequate Disclosures Concerning Problems at Pascua-Lama, Causing the Price of Barrick's Common Stock to Plummet

152.    In order to conceal its significant violations of the Pascua-Lama modified EIAs and its ineffective disclosure procedures and internal controls, Barrick management made multiple misrepresentations about its compliance with environmental safeguards, its compliance with generally accepted accounting principles in reporting the carrying value of Pascua-Lama, and falsely touted the effectiveness of its internal controls in its public statements.  As information about the problems at Pascua-Lama began to emerge, however, the price of the Company's securities tumbled.

153.    On May 24, 2013, the market was surprised by news of environmental problems at Pascua-Lama.  Specifically, several news outlets reported that Chile's Environmental Superintendent (the SMA) had imposed a fine of $16.4 million on Barrick for serious environmental violations at Pascua-Lama, and that it had ordered Barrick to undertake work to safeguard local water supplies.  The fine was the maximum that the SMA was permitted to impose under Chilean law.  According to the *Associated Press*, the SMA "found 23 violations, and Barrick accepted all but one of them."  Furthermore, "while Barrick itself reported failures, a separate and intensive investigation already begun by the agency's own inspectors found that the company wasn't telling the full truth."

154.    As a result of this news, trading of Barrick's shares was halted on the NYSE for about three hours around noon.

155.    In response, Barrick issued a press release, which stated:

> [Barrick] today received a resolution from Chile's Superintendence of the Environment (Superintendencia del Medio Ambiente or "SMA") that requires the company to complete Pascua-Lama's water management system in accordance with the project's environmental permit before resuming construction activities in Chile.
>
> The SMA also announced that the company will be subject to an administrative fine of approximately $16 million for deviations from certain requirements of the project's Chilean environmental approval, including a series of reporting requirements and instances of non-compliance related to the project's water management system.
>
> The company is in the process of reviewing the SMA resolution in detail.  Barrick is fully committed to complying with all aspects of the resolution and to operating at the highest environmental standards.

156.    Upon this news, the price of Barrick common stock dropped 2%.   Barrick common stock fell $0.39, from a price of $19.55/share at the close of trading on May 23, 2013, to a price of $19.16/share at the close of trading on May 24, 2013.

157.    Nevertheless, the full extent of Barrick's environmental infractions at Pascua-Lama was not revealed to the market by the May 24 disclosure.  Indeed, in response to this news, Silver Wheaton, the company that had purchased the rights to the silver reserves at Pascua-Lama, issued a statement in support of Barrick:

> "We remain confident in Barrick's ability to develop Pascua Lama into one of the world's great gold / silver mines," said Randy Smallwood, President and Chief Executive Officer of Silver Wheaton.  "Barrick has continued to show a strong commitment to exceeding regulatory compliance and protecting the environment, and it is worth highlighting that *there have been no negative environmental impacts at Pascua Lama to date*.  We remain confident in Barrick's commitment to this project, and look forward to seeing this issue resolved. Silver Wheaton looks forward to a long term partnership with Barrick on Pascua-Lama."

158.    On June 28, 2013, after the markets closed, the Company released an "Update[] on Pascua-Lama Project."  Barrick announced that it was finally conducting impairment testing

on Pascua-Lama, and expected to incur an impairment loss on the project of between $4.5 billion and $5.5 billion in the second quarter of 2013.  The Company also announced that it would be reducing its capital expenditures on Pascua-Lama in 2013 and 2014.   Subsequently, on August 2, 2013, Barrick confirmed that it was recording an impairment loss of $5.1 billion on Pascua-Lama.

159.    Upon the announcement of an impairment loss on June 28, 2013, the price of Barrick common stock dropped more than 3%.  Barrick common stock fell $0.49, from a price of $15.74/share at the close of trading on June 28, 2013, to a price of $15.25/share at the close of trading on July 1, 2013.

160.    Again, however, Barrick only partially disclosed the problems at Pascua-Lama. Indeed, on July 1, 2013, Silver Wheaton issued a statement that, based on its communications with Barrick, it still expected gold production to occur at Pascua-Lama.   Silver Wheaton CEO Smallwood commented in the statement:  "We are in regular contact with Barrick, and are confident that all the right measures are being taken to achieve production at this mine.  *Pascua-Lama is a world class gold and silver deposit and will be a world class mine once it begins production*."

161.    However, the market was shocked again a few months later when, on October 31, 2013, Barrick announced that it was suspending all construction at Pascua-Lama except for activities required for environmental and regulatory compliance.  CEO Sokalsky told investors on a conference call that same day that the decision was due, in part, to "risks and uncertainties related to regulatory and legal matters."  In response to this announcement, *Reuters* reported: "Barrick Gold Corp said on Thursday it would stop development of its Pascua-Lama mine in

South America indefinitely, *a surprise reversal* on a project that has already cost the world's largest gold producer more than $5 billion."

162.     As a result of this disclosure, Barrick common stock dropped almost 5.5%, from a close on October 30, 2013 of $20.50/share to a close on October 31, 2013 of $19.39 per share.

163.     Immediately after the close of trading on October 31, 2013, Barrick further shocked the market by filing a registration statement with the SEC for the issuance of $3.5 billion of new common shares.  Barrick announced that it planned to use the proceeds from the public offering to pay down debt and "to further strengthen its balance sheet, which could include further debt reductions and for general corporate purposes including ongoing operating and capital expenditures relating to Barrick's existing portfolio of mines."  Thus, not only was Barrick indefinitely suspending work on Pascua-Lama, it was having to raise new capital as a result of its fraud.

164.     Upon this new, the price of Barrick common stock dropped another 7.1%, closing on November 1, 2013 at a price of $18.01 per share.

165.     Today, Barrick is simply "holding" Pascua-Lama and spending the bare minimum of capital in order to do so.  As stated on Barrick's website, "in 2015, Barrick anticipates expenditures of approximately $170-$190 million for the project, including approximately $140-$150 million for care and maintenance, including water management system costs, and approximately $30-$40 million for other project costs, including those related to permit obligations in Argentina and Chile."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.     Misrepresentations Concerning Barrick's Environmental Compliance

166.     Throughout the relevant period, Barrick made materially false and misleading statements about its compliance with the environmental regulations governing Pascua-Lama.

167.    As noted above, under the modified EIA, Barrick agreed to comply with over 400 conditions to protect the environment and water supply from its mining operations at Pascua-Lama.

168.    Barrick repeatedly misrepresented to investors that it was in compliance with these measures.

169.    In its Third Quarter Report for 2010, released on October 28, 2010, and filed with the SEC on Form 6-K on October 29, 2010, Barrick misrepresented that its activities as Pascua-Lama "*are undertaken pursuant to existing environmental approvals issued on the basis of comprehensive environmental impact studies* that fully considered potential impacts on water resources, glaciers and other sensitive environmental areas around Veladero and Pascua-Lama."

170.    Barrick repeated this statement in the following SEC filings during the relevant period:  (1) Fourth Quarter Report for 2010, released on February 17, 2011, and filed with the SEC on February 18, 2011; (2) First Quarter Report for 2011, released on April 27, 2011, and filed with the SEC on April 29, 2011; (3) Second Quarter Report for 2011, released on July 28, 2011, and filed with the SEC on July 29, 2011; (4) Third Quarter Report for 2011, released on October 27, 2011, and filed on November 1, 2011; (5) Second Quarter Report for 2012, released on July 28, 2012, and filed with the SEC on July 27, 2012; and (6) Third Quarter Report for 2012, released on November 1, 2012, and filed with the SEC on November 2, 2012.

171.    Barrick's statement that its activities were undertaken pursuant to existing environmental approvals" at Pascua-Lama was materially false and misleading.  As explained in paragraphs 111 through 137, the Chilean authorities issued multiple resolutions between 2007 and 2013 finding that Barrick was consistently violating the provisions of the modified EIA. Among other things, Barrick:  (i) failed to wet or otherwise treat the roads at Pascua-Lama to

prevent the emission of toxic dust into the air; (ii) failed to limit the amount of trucks traveling to and from the mine, and failed to properly cover those trucks, which also increased the amount of dust emitted into the air and onto the glaciers; (iii) failed to properly implement a glacier monitoring program, which resulted in the authorities finding several centimeters of dust on glaciers; and (iv) failed to construct a water management system.  Barrick also was not diverting sedimentation from major earthworks in Argentina.

172.    On October 28, 2010, CEO Regent misrepresented to investors and analysts on an earnings call that the Pascua-Lama project was "not impacting the glaciers surrounding our operations."

173.    This statement was materially false and misleading.  As early as November 26, 2009, Chilean authorities found that Barrick was violating conditions of the modified EIA designed to protect glaciers.  Specifically, the Chilean authorities discovered that Barrick had not wet the roads on dry days and had not otherwise treated the roads to prevent dust from rising, which was increasing the dust landing on the surface of the glaciers.  Indeed, in a subsequent inspection of Pascua-Lama, Chilean authorities found that two glaciers were covered by several centimeters of dust.  Barrick was fined for its failure to comply with the conditions of the modified EIA concerning glacier protection.

174.    In April 2011, Barrick published on its website its Responsibility Report for 2010. In that report, Barrick misrepresented that:

> *We conduct environmental audits to verify that* management systems are adequate to ensure performance commitments are achieved and that *our operations are in compliance with government regulations and internal standards*. When audits identify deficiencies, *our investigations attempt to recognize the fundamental causes underlying these deficiencies so that effective corrective and preventative actions can be implemented.*

-48-

175.    Similarly, in April 2012, Barrick published on its website its Responsibility Report for 2011, which repeated the statement above.

176.    These statements in Barrick's 2010 and 2011 Responsibility Reports were materially false and misleading because Barrick's operations were not in compliance with government regulations.   Specifically, as set forth above in paragraphs 111 through 137, Barrick's operations at Pascua-Lama violated multiple conditions of the modified EIAs. Moreover, Barrick failed to implement effective actions to correct these violations and prevent further violations.   Indeed, Barrick's continued environmental infractions ultimately led to the forced closure of the Pascua-Lama project.

177.    On December 14, 2011, Barrick again made misrepresentations about its environmental compliance at Pascua-Lama in a statement released on its website.   Barrick falsely claimed that it was "committed to carrying out its activities around the world according to high environmental, operational, and social standards."

178.    This statement was materially false and misleading.   Rather than carrying out its activities at Pascua-Lama "according to high environmental, operational, and social standards," Barrick consistently sacrificed these standards in order to cut costs.   For example, rather than construct a water management system in accordance with the modified EIA, Barrick constructed a cheaper version with the hope that it would be able to obtain *post hac* approval for the design from the Chilean authorities.   A government inspection of Pascua-Lama less than a month prior to the issuance of the December 14, 2011 statement discovered that Barrick was improperly storing and disposing of chemicals and other industrial waste, and was inadequately maintaining a water treatment plant.   Thus, Barrick decidedly *was not* conducting its environmental activities in accordance with high standards.

179.    Barrick's December 14, 2011 release also misrepresented that Barrick had "implemented a glacier monitoring program for the entire Pascua-Lama project area, along with additional requirements associated with glacier protection as mandated in the project's environmental approval."

180.    This statement too was materially false and misleading.  Barrick identified flaws in its glacier monitoring program in its July 2011 Pascua-Lama Monthly Project Report. Moreover, Chilean authorities found numerous failings in Barrick's glacier monitoring plan, including that reports generated by the plan contained errors and omissions, and were not being timely submitted by Barrick.

181.    Finally, the December 14, 2011 release misrepresented that Barrick had "put in place a range of measures to mitigate the potential dust impact of dust emissions on glaciers."

182.    This statement was materially false and misleading because Chilean authorities discovered that Barrick consistently flouted the dust mitigation measures imposed by the modified EIA.  Chilean authorities complained about Barrick's failure to properly wet roads to prevent dust emissions as far back as November 2009.  Barrick continuously failed to comply with this important condition of the modified EIA for several years.  Thus, its statement that it had implemented measures to mitigate the dust impact on glaciers was false.

183.    On April 24, 2013, Defendants hosted an earnings call to discuss Barrick's financial results for the first quarter of 2013.   During that call Defendant Sokalsky misrepresented to investors that, "we have been repairing and improving the water management system in Chile.  It is important to note that ***there has been no adverse impact on water quality or glaciers***, and we expect work necessary for environmental protection to continue."

184.    This statement was materially false and misleading.  As noted above, rather than construct a water management system in accordance with the modified EIA, Barrick constructed a cheaper version with the hope that it would be able to obtain *post hac* approval for the design from the Chilean authorities.  A government inspection of Pascua-Lama in 2011 discovered that Barrick was improperly storing and disposing of chemicals and other industrial waste, and was inadequately maintaining a water treatment plant.  The Chilean authorities also discovered that Barrick had not wet the roads on dry days and had not otherwise treated the roads to prevent dust from falling onto glaciers, and found that two glaciers were covered by several centimeters of dust as a result.

**B.     Misrepresentations Concerning Barrick's Disclosure Procedures and Internal Controls**

185.    Throughout the relevant period, Barrick, Regent and Sokalsky made numerous false and misleading statements about Barrick's disclosure procedures and internal controls.

186.    Barrick's 2010 Annual Report filed with the SEC on Form 40-F on March 31, 2011, contained several misrepresentations concerning the Company's disclosure procedures and internal controls.  Barrick misrepresented to investors that:

> An evaluation was carried out under the supervision of and with the participation of Barrick's management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures and internal controls over financial reporting (as defined in rules adopted by the SEC) as at December 31, 2010.  Based on that evaluation, Barrick's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures and internal control over financial reporting were effective as at December 31, 2010.

187.    The 2010 Annual Report also contained a report by Barrick management on the Company's internal controls over financial reporting.  Barrick falsely assured investors:

> Barrick's Management assessed the effectiveness of the Company's internal control over financial reporting as at

December 31, 2010.  Barrick's Management used the Committee of Sponsoring Organizations of the Treadway Commission (COSO) framework to evaluate the effectiveness of Barrick's internal control over financial reporting. Based on Barrick Management's assessment, Barrick's internal control over financial reporting is effective as at December 31, 2010.

188.    In the financial statements accompanying its 2010 Annual Report, CFO Sokalsky falsely represented that, "[t]he Company has developed and maintains a system of internal accounting controls in order to ensure, on a reasonable and cost effective basis, the reliability of its financial information."

189.    Finally, both CEO Regent and CFO Sokalsky provided false certifications with Barrick's 2010 Annual Report:

190.    Regent and Sokalsky each certified:

> 2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

> 4.   [Barrick]'s other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the issuer and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

-52-

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the issuer's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting; and

5. The issuer's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the issuer's auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting.

191.    Barrick's 2011 Annual Report filed with the SEC on Form 40-F on March 28, 2012, contained identical misrepresentations and false certifications by Barrick, Regent and Sokalsky concerning the effectiveness of Barrick's internal controls over financial reporting and disclosure controls and procedures as of December 31, 2011.  Like the 2010 Annual Report, Barrick's 2011 Annual Report included a report by Barrick management on the Company's

internal controls over financial reporting, CFO Sokalsky's representation about Barrick's accounting controls, and the certifications from Regent and Sokalsky required under SOX.

192.    Barrick's 2012 Annual Report filed with the SEC on Form 40-F on March 28, 2013, contained substantially identical misrepresentations and false certifications by Barrick, Sokalsky and Al-Joundi concerning the effectiveness of Barrick's internal controls over financial reporting and disclosure controls and procedures as of December 31, 2012.   Barrick's 2012 Annual Report included a report by Barrick management on the Company's internal controls over financial reporting, CFO Al-Joundi's representation about Barrick's accounting controls, and the certifications from Sokalsky and Al-Joundi required under SOX.

193.    The statements in Barrick's 2010, 2011 and 2012 Annual Reports set forth above in paragraphs 186 through 192 were materially false and misleading because they concealed that Barrick's disclosure and internal controls suffered from material weaknesses.  Specifically, as set forth in Barrick's Pascua-Lama Project Monthly Project Reports between July 2011 and January 2012:

> a.  Prior to proceeding with construction at Pascua-Lama in 2009 and 2010, Barrick had failed to establish a project management framework;
>
> b.  Pascua-Lama's monthly reports contained significant inaccuracies, omissions and inconsistencies;
>
> c.  The cost management process at Pascua-Lama suffered from weaknesses and inaccurate reporting;
>
> d.  The program plans for Pascua-Lama were incomplete and not consistently updated; and
>
> e.  Weaknesses existed in Barrick's risk management process that contributed to inaccurate reporting.

194.    As discussed in more detail below, these material weaknesses in Barrick's internal controls resulted in the material misstatement of financial information relating to the carrying

value of Pascua-Lama and Barrick's net income and earnings per share Barrick's financial reports.

195.     Barrick made similar misrepresentations about its internal controls in its quarterly reports filed with the SEC.   In its Third Quarter Report for 2010 filed with the SEC on October 29, 2010, Barrick misrepresented:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting and disclosure. Internal control over financial reporting (ICFR) is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with US GAAP.
>
> Disclosure controls and procedures (DC&P) are designed to ensure that other financial and non-GAAP information included in reports such as this MD&A fairly present in all material respects the financial condition, results of operations and cash flows of the Company for the periods presented. The Company's DC&P are intended to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to Management by others within those entities, particularly during the period in which this MD&A is being prepared.
>
> . . .
>
> . . . .  Management will continue to monitor the effectiveness of its internal control over financial reporting and disclosure frameworks and may make modifications from time to time as considered necessary or desirable.

196.     In its Fourth Quarter Report for 2010, filed with the SEC on Form 6-K on February 18, 2011, Barrick misrepresented:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting and disclosure controls and procedures.  Internal control over financial reporting is a framework designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with US GAAP.  The Company's internal control over financial reporting framework includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions

and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with US GAAP, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the Company's consolidated financial statements.

Disclosure controls and procedures form a broader framework designed to ensure that other financial information disclosed publicly fairly presents in all material respects the financial condition, results of operations and cash flows of the company for the periods presented in this MD&A and Barrick's Annual Report. The Company's disclosure controls and procedures framework includes processes designed to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to management by others within those entities to allow timely decisions regarding required disclosure.

Together, the internal control over financial reporting and disclosure controls and procedures frameworks provide internal control over financial reporting and disclosure. . . . . Management will continue to monitor the effectiveness of its internal control over financial reporting and disclosure and may make modifications from time to time as considered necessary or desirable. It is not expected that the 2011 conversion to IFRS . . . will impact the effectiveness of the internal control over financial reporting and disclosure in the upcoming year.

The management of Barrick, at the direction of our chief executive and financial officers, have evaluated the effectiveness of the design and operation of the internal controls over financial reporting and disclosure controls and procedures as of the end of the period covered by this report and have concluded that they were effective at a reasonable assurance level.

197.   Barrick substantially repeated this misrepresentation in its Fourth Quarter Report for 2011, filed with the SEC on February 17, 2012, and in the Fourth Quarter Report for 2012, filed with the SEC on February 15, 2013.

198.     In its First Quarter Report for 2011, filed with the SEC on April 29, 2011, Barrick

misrepresented:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting and disclosure controls and procedures.
>
> Internal control over financial reporting is a framework designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with IFRS. The Company's internal control over financial reporting framework includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with IFRS, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the Company's consolidated financial statements.
>
> Disclosure controls and procedures form a broader framework designed to ensure that other financial information disclosed publicly fairly presents in all material respects the financial condition, results of operations and cash flows of the company for the periods presented in this Report. The Company's disclosure controls and procedures framework includes processes designed to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to management by others within those entities to allow timely decisions regarding required disclosure.
>
> Together, the internal control over financial reporting and disclosure controls and procedures frameworks provide internal control over financial reporting and disclosure. . . .
>
> It is not expected that the Company's conversion to IFRS will impact the effectiveness of the internal control over financial reporting and disclosure in the upcoming year. Management will continue to monitor the effectiveness of its internal control over financial reporting and disclosure and may make modifications from time to time as considered necessary or desirable.

199.   Barrick repeated this misrepresentation verbatim in its Second Quarter Report for 2011, filed with the SEC on July 29, 2011, and in its Third Quarter Report for 2011, filed with the SEC on November 1, 2011.

200.   In its First Quarter Report for 2012, filed with the SEC on May 5, 2012, Barrick misrepresented:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting and disclosure controls and procedures as defined in our 2011 annual MD&A.
>
> Together, internal control over financial reporting and disclosure controls and procedures frameworks provide internal control over financial reporting and disclosure . . . .
>
> Management will continue to monitor the effectiveness of its internal control over financial reporting and disclosure and may make modifications from time to time as considered necessary or desirable.

201.   Barrick substantially repeated this misrepresentation in its First Quarter Report for 2013, filed with the SEC on April 25, 2013, and in its Third Quarter Report for 2013, filed with the SEC on August 2, 2013.

202.   The statements in Barrick's quarterly reports set forth above in paragraphs 195 to 201 were materially false and misleading for the reasons set forth above in paragraphs 193 to 194.

203.   In its Second Quarter Report for 2012, filed with the SEC on July 27, 2012, and in its Third Quarter Report for 2012, filed with the SEC on November 2, 2012, Barrick again misrepresented its management's responsibility for "establishing and maintaining adequate internal control over financial reporting and disclosure controls and procedures." This statement was materially false and misleading for the reasons set forth above in paragraphs 193 to 194.

204.    In addition, Barrick misrepresented the extent of the material weaknesses in its

internal controls at Pascua-Lama.  Specifically, in its Second Quarter Report for 2012, Barrick

stated:

> As described on page 15 of this report, we are continuing a
> detailed review of the capital cost estimate and schedule for the
> Pascua-Lama project and intend to realign the Pascua-Lama
> project management structure.   As part of this review and
> realignment, management will assess the impact on internal control
> over financial reporting and disclosure.
>
> Management will continue to monitor the effectiveness of its
> internal control over financial reporting and disclosure and may
> make modifications from time to time as considered necessary or
> desirable.

205.    Barrick made a similar misrepresentation in in Third Quarter Report for 2013.

206.    On page 15 of the Second Quarter Report for 2013, Barrick had stated that:

> [D]ue to lower than expected productivity and persistent
> inflationary and other cost pressures, the company initiated a
> detailed review of Pascua-Lama's schedule and cost estimate in the
> second quarter.
>
> . . . [P]reliminary results currently indicate that initial gold
> production is now expected in mid-2014, with an approximate 50-
> 60 percent increase in capital costs from the top end of the
> previously announced estimate of $4.7-$5.0 billion. . . .
>
> Based on information gathered to date, it is apparent that the
> challenges of building a project of this scale and complexity were
> greater than we anticipated.  We also determined that we needed to
> re-align the project management structure between Barrick and our
> EPCM partners, Fluor and Techint. We have taken immediate
> actions to address these issues. We are strengthening the project
> management structure by seeking to have Fluor take over a greater
> proportion of the construction management of the project. Barrick
> is also working with Fluor and Techint to develop an integrated
> action plan that ensures the scope of remaining work is well
> planned and executed and has also engaged a leading EPCM
> organization to provide an independent assessment of the status of
> the project.

207.    Thus, despite noting that it had conducted a review of Pascua-Lama, Barrick completely failed to inform investors of the material weaknesses in its internal controls and disclosure procedures with respect to Pascua-Lama that Barrick had identified in its Monthly Project Reports in 2011 and 2012.  This omission rendered the above statements in the Second and Third Quarter Reports for 2012 materially false and misleading.

C.    **Misrepresentations Concerning Barrick's Impairment Testing, the Carrying Amount of Pascua-Lama and Barrick's Net Income and Earnings Per Share**

208.    Throughout the relevant period, Barrick made numerous false and misleading statements about its impairment testing of Pascua-Lama.

209.    In its Third Quarter Report for 2010, filed with the SEC on Form 6-K on October 29, 2010, Barrick misrepresented its impairment evaluation procedures:

> We review and test the carrying amounts of long-lived assets when events or changes in circumstances suggest that the carrying amount may not be recoverable.  Impairment assessments are conducted at the level of cash-generating units ("CGUs"), which is the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets. . . .
>
> . . . .   Any impairment is recognized as an expense in the consolidated statements of income in the reporting period in which the write-down occurs.

210.    Barrick repeated this statement verbatim in its Fourth Quarter Report for 2010, filed with the SEC on February 18, 2011, and substantially repeated this statement in its Second Quarter Report for 2011, filed with the SEC on July 29, 2011.

211.    In its 2010 Annual Report, released and filed with the SEC on March 31, 2011, Barrick further misrepresented its impairment evaluation procedures:

> We review and test the carrying amounts of assets when events or changes in circumstances suggest that the carrying amount may not be recoverable.  We group assets at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities.  For operating mines, capital projects

-60-

and petroleum and natural gas properties, the individual
mine/project/property is a single reporting unit for impairment
testing purposes.  A potential impairment is identified if the sum of
the reporting unit's undiscounted cash flows is less than its
carrying amount.  When a potential long-lived asset impairment is
identified, the amount of impairment is calculated by comparing its
fair value to its carrying amount.

212.    In its Third Quarter Report for 2011, filed with the SEC on November 1, 2011,

Barrick further misrepresented its impairment evaluation procedures:

> We review and test the carrying amounts of PP&E and intangible
> assets with definite lives when indicators of impairments are
> considered to exist.   Impairment assessments on PP&E and
> intangible assets are conducted at the level of Cash Generating
> Units ("CGU"), which is the lowest level at which identifiable cash
> flows are largely independent of the cash flows of other assets. . . .
>
> We conduct an annual test for impairment of goodwill in the fourth
> quarter of each fiscal year and at any other time of the year if an
> indicator of impairment is identified.  . . . We record an impairment
> if the carrying amount of the operating segment exceeds its
> recoverable amount and, consequently, reduce the carrying value
> to its recoverable amount.
>
> Circumstances that could trigger an impairment test on goodwill or
> long-lived assets include, but are not limited to: a significant
> adverse business, legal or regulatory development; the likelihood
> that a CGU or a significant portion of a CGU will be sold or
> otherwise disposed of; or a significant change to the operating
> plans of a CGU.

213.    Barrick again misrepresented its impairment evaluation procedures in its 2011

Annual Report, released and filed with the SEC on March 28, 2012:

> Non-current assets are tested for impairment when events or
> changes in circumstances suggest that the carrying amount may not
> be recoverable.  The recoverable amount is calculated using the
> [Fair Value Less Costs to Sell approach].    However, the
> assessment is done at the [cash generating unit] level, which is the
> lowest level for which identifiable cash flows are largely
> independent of the cash flows of other assets.

214.    In its First Quarter Report for 2012, filed with the SEC on May 5, 2012, Barrick misrepresented its impairment evaluation procedures and the fact that there were no indications of impairment discovered by the Company:

> Non-current assets are tested for impairment when events or changes in circumstances suggest that the carrying amount may not be recoverable. We conduct an annual test for impairment of goodwill in the fourth quarter of each fiscal year and at any other time of the year if an indicator of impairment is identified.  No triggering events were identified in first quarter 2012.

215.    These statements concerning Barrick's impairment evaluation procedures were materially false and misleading.  Numerous indicators that the carrying amount of Pascua-Lama might not be recoverable arose during the relevant period.  Specifically, as detailed above in paragraphs 111 through 137, between 2007 and 2013 Barrick committed multiple violations of the modified EIA for which the Chilean authorities discovered and sanctioned Barrick.  As Barrick persistently failed to meet the conditions of the modified EIA, it became clear that the carrying amount of Pascua-Lama would not be recoverable because Chilean authorities were likely to suspend construction at Pascua-Lama.  Moreover, as detailed above in paragraphs 140 through 147, Barrick identified material weaknesses in its disclosure procedures and internal controls in its Pascua-Lama Project Monthly Progress Reports.  These material weaknesses were indicators that the carrying amount of Pascua-Lama might not be recoverable due to, among other things, a lack of a program management framework, incomplete program plans, weak cost management, and insufficient risk management.  Contrary to the above representations, therefore, Barrick did not properly test Pascua-Lama for impairment when an event or change in circumstances suggested that the carrying amount may not be recoverable.

216.    In its Second Quarter Report for 2012, filed with the SEC on July 27, 2012, Barrick not only misrepresented its impairment evaluation procedures, but also failed to disclose the existence of multiple impairment indicators at Pascua-Lama.  Specifically:

> Non-current assets are tested for impairment when events or changes in circumstances suggest that the carrying amount may not be recoverable. We conduct an annual test for impairment of goodwill in the fourth quarter of each fiscal year and at any other time of the year if an indicator of impairment is identified. Our update to Pascua-Lama's schedule and cost estimate in the second quarter has been identified as a triggering event for impairment testing purposes. Consequently, we have assessed the impact and determined that the fair value of the project exceeds its carrying value.

217.    This statement was materially false and misleading for the reasons set forth in paragraph 215.  Moreover, the statement was materially false and misleading because it indicated that the only impairment triggering event identified by Barrick was its "update to Pascua-Lama's schedule and cost estimate in the second quarter," when in fact there were additional impairment triggering events that had been identified by Barrick management, including its persistent violations of the modified EIAs and the internal control deficiencies set forth in the 2011 and 2012 Pascua-Lama Monthly Project Reports.

218.    In its Third Quarter Report for 2012, filed with the SEC on November 2, 2012, Barrick misrepresented its impairment evaluation procedures and the lack of an impairment at Pascua-Lama:

> We conduct an annual test for impairment of goodwill in the fourth quarter of each fiscal year and at any other time of the year if an indicator of impairment is identified. In addition, non-current assets are tested for impairment when events or changes in circumstances suggest that the carrying amount may not be recoverable. Each quarter we conduct a review of internal factors (such as operating performance, changes in reserves/resources or changes in the mine plans) and external factors (such as metal prices, discount rates and foreign exchange rates) for each operating site, project and E&E property to determine whether

> such an indicator of impairment exists. In third quarter 2012, the
> only indicator of impairment that was identified was at an
> exploration property in Papua New Guinea acquired in 2007,
> where we completed an exploration program and a decision was
> made not to proceed with further exploration activities. . . .   In
> second quarter 2012, the update to Pascua-Lama's schedule and
> cost estimate was identified as a triggering event for impairment
> testing purposes. We assessed the impact and determined that the
> fair value of the project exceeded its carrying value and
> consequently no impairment was recorded.

219.    This statement was materially false and misleading for the reasons set forth above

in paragraph 215.  Moreover, Barrick should have recorded an impairment given that the fair

value of Pascua-Lama clearly did not exceed its carrying value in light of Barrick's persistent

violations of the modified EIAs and its internal control deficiencies set forth in the 2011 and

2012 Pascua-Lama Monthly Project Reports.

220.    In its Fourth Quarter Report for 2012, filed with the SEC on February 15, 2013,

and in its 2012 Annual Report, filed with the SEC on March 28, 2012, Barrick again

misrepresented its impairment evaluation procedures and the lack of an impairment at Pascua-

Lama.

> Non-current assets are tested for impairment when events or
> changes in circumstances suggest that the carrying amount may not
> be recoverable.  The recoverable amount is calculated using the
> [Fair Value Less Costs to Sell approach].   However, the
> assessment is done at the [cash generating unit] level, which is the
> lowest level for which identifiable cash flows are largely
> independent of the cash flows of other assets.
>
> . . .
>
> In second quarter 2012 we identified a potential indicator of
> impairment at our Pascua-Lama project based on the significant
> increase in the expected construction costs and delay in the
> expected completion date. We conducted an impairment
> assessment at that time and determined that the fair value of the
> project exceeded its carrying value. In fourth quarter 2012, upon
> completion of the cost estimate, schedule and the associated LOM
> plan, we updated our assessment and determined that the fair value

of the project exceeds its carrying value as at December 31, 2012 by about $1.5 billion. . . .   As at December 31, 2012, the carrying value of Pascua-Lama is $5.24 billion (2011: $3.06 billion).

221.     This statement was materially false and misleading for the reasons set forth above in paragraphs 215 and 219.

222.     On April 25, 2013, Barrick filed its First Quarter Report for 2013.   This filing contained numerous misrepresentations about impairment.

> Non-current assets are tested for impairment when events or changes in circumstances suggest that the carrying amount may not be fully recoverable.  We conduct an annual test for impairment of goodwill in the fourth quarter of each fiscal year and at any other time of the year if an indicator of impairment is identified. . . .
>
> . . .
>
> On April 9, 2013, the Copiapó Court of Appeals in Chile granted a request for a preliminary injunction to suspend construction activities on the Chilean side of the project pending a hearing on a constitutional rights action filed in September of 2012.  The action alleges noncompliance with the environmental requirements of the project's Chilean environmental approval.  Upon confirming the court order, Barrick took immediate steps to suspend construction activities in Chile, which includes work on the primary crusher and the Chilean side of the tunnel that conveys ore from Chile to Argentina.   Activities determined to be necessary for environmental protection are expected to continue, upon appropriate authorization as contemplated by the Court. Construction in Argentina, where the majority of Pascua-Lama's critical infrastructure is located, including the process plant and tailings storage facility, has not been affected.  Until we have clarity on the regulatory and legal aspects, we are unable to fully assess the impact on the capital budget, operating costs and schedule of the project. . . .   We identified the granting of the injunction as an indicator of potential impairment.  Based on the information available to us, and having assessed the recoverable amount of the project, we concluded that the carrying value of the project was not impaired as at March 31, 2013.

223.     This statement was materially false and misleading for the reasons set forth above in paragraph 215.   Moreover, Barrick management was fully aware at that time that there were

additional indicators of impairment that required Barrick to record an impairment loss on Pascua-Lama. Specifically, Barrick should have recorded an impairment given that the fair value of Pascua-Lama clearly did not exceed its carrying value in light of Barrick's persistent violations of the modified EIAs and its internal control deficiencies set forth in the 2011 and 2012 Pascua-Lama Monthly Project Reports.

224. Barrick's failure to recognize an impairment loss on Pascua-Lama prior to the second quarter of 2013 also rendered its financial statements materially false and misleading. Specifically, the carrying value of Pascua-Lama was overstated by at least $5.1 billion (the impairment loss that Barrick later realized) due to Barrick's persistent failure to comply with conditions of the modified EIA and the material weaknesses in its internal controls that existed by no later than July 2011. The following amounts reported by Barrick were materially false and misleading:

- In its Third Quarter Report for 2010 filed with the SEC on October 29, 2010, Barrick materially overstated: Pascua-Lama's carrying value as $1.698 billion dollars as of September 30, 2010; Barrick's net income as $837 million for the quarter ended September 30, 2010; and Barrick's earnings per share as $0.85 for the quarter ended September 30, 2010.

- In its Fourth Quarter Report for 2010, filed with the SEC on February 18, 2011, Barrick materially overstated: Pascua-Lama's carrying value as $2.164 billion dollars as of December 31, 2010; Barrick's net income as $896 million for the quarter ended December 31, 2010, and $3.274 billion for the year ended December 31, 2010; and Barrick's earnings per share as $0.90 for the quarter ended December 31, 2010, and $3.32 for the year ended December 31, 2010.

- In its 2010 Annual Report, filed with the SEC on March 31, 2011, Barrick materially overstated: Pascua-Lama's carrying value as $2.164 billion dollars as of December 31, 2010; Barrick's net income as $3.274 billion for the year ended December 31, 2010; and Barrick's earnings per share as $3.32 for the year ended December 31, 2010.

- In its First Quarter Report for 2011, filed with the SEC on April 29, 2011, Barrick materially overstated: Pascua-Lama's carrying value as $2.463 billion dollars as of March 31, 2011; Barrick's net income as $1.015 billion for the quarter ended March 31, 2011; and Barrick's earnings per share as $1.00 for the quarter ended March 31, 2011.

- In its Second Quarter Report for 2011, filed with the SEC on July 29, 2011, Barrick materially overstated: Pascua-Lama's carrying value as $2.781 billion dollars as of June 30, 2011; Barrick's net income as $1.180 billion for the quarter ended June 30, 2011; and Barrick's earnings per share as $1.16 for the quarter ended June 30, 2011.

- In its Third Quarter Report for 2011, filed with the SEC on November 1, 2011, Barrick materially overstated: Pascua-Lama's carrying value as $3.249 billion dollars as of September 30, 2011; Barrick's net income as $1.383 billion for the quarter ended September 30, 2011; and Barrick's earnings per share as $1.37 for the quarter ended September 30, 2011.

- In its Fourth Quarter Report for 2011, filed with the SEC on February 17, 2012, Barrick materially overstated: Pascua-Lama's carrying value as $3.749 billion dollars as of December 31, 2011; Barrick's net income as $4.537 billion for the year ended December 31, 2011; and Barrick's earnings per share as $0.96 for the quarter ended December 31, 2011, and $4.49 for the year ended December 31, 2011.

- In its 2011 Annual Report, released and filed with the SEC on March 28, 2012, Barrick materially overstated: Pascua-Lama's carrying value as $3.749 billion dollars as of December 31, 2011; Barrick's net income as $4.537 billion for the year ended December 31, 2011; and Barrick's earnings per share as $4.49 for the year ended December 31, 2011.

- In its First Quarter Report for 2012, filed with the SEC on May 3, 2012, Barrick materially overstated: Pascua-Lama's carrying value as $4.132 billion dollars as of March 31, 2012; Barrick's net income as $1.039 billion for the quarter ended March 31, 2012; and Barrick's earnings per share as $1.03 for the quarter ended March 31, 2012.

- In its Second Quarter Report for 2012, filed with the SEC on July 27, 2012, Barrick materially overstated: Pascua-Lama's carrying value as $4.739 billion dollars as of June 30, 2012; Barrick's net income as $754 million for the quarter ended June 30, 2012; and

Barrick's earnings per share as $0.75 for the quarter ended June 30, 2012.

- In its Third Quarter Report for 2012, filed with the SEC on November 2, 2012, Barrick materially overstated: Pascua-Lama's carrying value as $5.276 billion dollars as of September 30, 2012; Barrick's net income as $622 million for the quarter ended September 30, 2012; and Barrick's earnings per share as $0.62 for the quarter ended September 30, 2012.

- In its Fourth Quarter Report for 2012, filed with the SEC on February 15, 2012, Barrick materially: overstated Pascua-Lama's carrying value as $5.861 billion dollars as of December 31, 2012; understated Barrick's net loss as $3.062 billion for the quarter ended December 31, 2012, and $665 million for the year ended December 31, 2012; and understated Barrick's loss per share as $3.06 for the quarter ended December 31, 2010, and $0.66 for the year ended December 31, 2010.

- In its 2012 Annual Report, filed with the SEC on March 28, 2013, Barrick materially: overstated Pascua-Lama's carrying value as $5.861 billion dollars as of December 31, 2012; understated Barrick's net loss as $677 million for the year ended December 31, 2012; and understated Barrick's loss per share as $0.66 for the year ended December 31, 2012.

- In its First Quarter Report for 2013, filed with the SEC on April 25, 2013, Barrick materially overstated: Pascua-Lama's carrying value as $6.536 billion dollars as of March 31, 2013; Barrick's net income as $861 million for the quarter ended March 31, 2013; and Barrick's earnings per share as $0.85 for the quarter ended March 31, 2013.

## ADDITIONAL ALLEGATIONS OF SCIENTER

225.   Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

226.   Numerous facts alleged herein establish Defendants' scienter with respect to the materially false and misleading statements concerning Barrick's environmental compliance, the existence and effectiveness of internal controls, and Barrick's failure to recognize an impairment loss on Pascua-Lama.

227.   For example, the Pascua-Lama Project Monthly Project Reports detailing Barrick's violations of the modified EIA were circulated to the Toronto office, including to Defendants Kinver and Gonzales.  The Chilean resolutions imposing sanctions on Barrick were sent to Barrick's top legal official in Chile.  And, Barrick executives have admitted that they traveled to Pascua-Lama frequently for site visits.

228.   Each of the Individual Defendants was a senior executive at Barrick.  Barrick emphasized to investors the hands-on role of it senior executives in project management, especially with respect to environmental compliance.

229.   In particular, Barrick's CEO, COO and its "most senior executives" (i.e., the Individual Defendants) sat on Barrick's "Executive Community, Environmental, Health, Safety, and Security (CHESS) Committee."   The purpose of this management committee was to "review[] performance, trends, and issues[,] and approve[] CHESS policies and business plans."  Thus, the Individual Defendants had access to material information concerning environmental and performance issues at Pascua-Lama.

230.   Moreover, it is indisputable that Pascua-Lama was a cornerstone project for Barrick.  Because Pascua-Lama was part of Barrick's core operations, the Individual Defendants are presumed to have knowledge of all material facts regarding Pascua-Lama.

231.   This is corroborated by Barrick's own statements.  During Barrick's earnings call for the second quarter of 2009, CEO Regent labeled Pascua-Lama as a "*milestone event for Barrick*" and "a low cost long life project which is expected to have *a significant impact on our future production, cash cost, cash flow and earnings.*"

232.     Three years later, on Barrick's earnings call for the fourth quarter of 2011, Regent was still beating the Pascua-Lama drum, referring to it as a "*major contributor[] to the company for some years to come*."

233.     When Sokalsky took over for Regent as CEO, during Barrick's earnings call for the second quarter of 2012, he referred to Pascua-Lama as the "*#1 priority for me and my team*."

234.     Pascua-Lama's importance to Barrick is further highlighted by the amount of capital expenditures it committed to the project.   For example, in 2011, Barrick spent approximately $1.2 billion in capital expenditures on Pascua-Lama, which was more than half of its total project capital expenditures for the year and more than twice the capital expenditures on any other capital project that year.

## PRESUMPTION OF RELIANCE

235.     Plaintiffs intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:   (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) Barrick common stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Barrick common stock; and (e) Plaintiffs purchased Barrick common stock between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

236.     The market for Barrick common stock was open, well-developed and efficient at all relevant times.   As a result of the aforementioned materially false and misleading statements and failures to disclose, Barrick common stock traded at artificially inflated prices during the relevant period.   The artificial inflation continued until the time the market came to realize the truth about Pascua-Lama.

237.    At all relevant times, the market for Barrick common stock was efficient for the following reasons, among others:  (a) Barrick filed periodic reports with the SEC; (b) the stock was listed and actively traded on the NYSE; (c) numerous analysts, including analysts from Morgan Stanley and Deutsche Bank, followed Barrick; and (d) Barrick regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

238.    Plaintiffs purchased Barrick common stock in reliance on the market price of Barrick common stock, which reflected all the information in the market, including the misstatements by Defendants.

## LOSS CAUSATION

239.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased Barrick common stock, as described above in paragraphs 20 through 22 and Exhibit A, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  As Barrick issued a series of partial but inadequate disclosures about problems at Pascua-Lama, as detailed above in paragraphs 152 through 164, the price of those securities dropped, and Plaintiffs were damaged.

240.    Barrick desperately sought to reassure investors of its compliance with the modified EIAs.  In doing so, the Company concealed the foreseeable risk that its blatant disregard of Chilean environmental regulations would result in Pascua-Lama being shut down by Chilean authorities.  Beginning with the May 24 disclosure that the SMA had imposed a fine of

$16.4 million on Barrick for serious environmental violations at Pascua-Lama, that foreseeable risk gradually materialized, thus causing Barrick common stock to decline as detailed above.

241.    Moreover, Barrick also sought to reassure investors that its internal controls were effective.  In doing so, the Company concealed the foreseeable risk that its lack of meaningful controls would result in cost escalation and production delays at Pascua-Lama.  Beginning with the May 24 disclosure that the SMA had imposed a fine of $16.4 million on Barrick for serious environmental violations at Pascua-Lama, that foreseeable risk gradually materialized, thus causing Barrick common stock to decline as detailed above.

242.    Finally, Barrick represented to investors that its asset impairment evaluation procedures were conducted in accordance with generally accepted accounting principles.  In doing so, the Company concealed the foreseeable risk that its lack of effective controls over financial reporting resulted in its failure to properly and timely impair the carrying value of Pascua-Lama.  Beginning with the May 24 disclosure that the SMA had imposed a fine of $16.4 million on Barrick for serious environmental violations at Pascua-Lama, that foreseeable risk gradually materialized, thus causing Barrick common stock to decline as detailed above.

## NO SAFE HARBOR

243.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Barrick who knew that those statements were false when made.

## FIRST CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants Except Veenman

244.    Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

245.    This Cause of Action is asserted against Barrick, Regent, Sokalsky, Al-Joundi, Kinver, Potter, and Gonzales for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

246.    Defendants Barrick, Regent, Sokalsky, Al-Joundi, Kinver, Potter, and Gonzales both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Barrick common stock; and (iii) cause Plaintiffs to purchase Barrick common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Barrick, Regent, Sokalsky, Al-Joundi, Kinver, Potter, and Gonzales took the actions set forth herein.

247.    Defendants Barrick, Regent, Sokalsky, Al-Joundi, Kinver, Potter, and Gonzales both directly and indirectly:  (i) employed devices, schemes and artifices to defraud; (ii) made

untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Barrick common stock in an effort to artificially inflate and maintain the market prices for Barrick common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

248.   By virtue of their high-level positions at the Company, Regent, Sokalsky, Al-Joundi, Kinver, Potter, and Gonzales were authorized to make public statements, and made public statements on Barrick's behalf.  These executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

249.   In addition, Barrick, Regent, Sokalsky, Al-Joundi, Kinver, Potter, and Gonzales had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading, including information with respect to Pascua-Lama, so that the market price of the Company's securities would be based on truthful, complete and accurate information.

250.   Barrick, Regent, Sokalsky, Al-Joundi, Kinver, Potter, and Gonzales acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.  Barrick's, Regent's, Sokalsky's, Al-Joundi's, Kinver's, Potter's, and Gonzales' material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Barrick's operations, business, performance and prospects from the investing public, including misstating the

effectiveness of the Company's internal controls, the valuation of the Company's assets and costs associated with Pascua-Lama, and the Company's compliance with applicable environmental regulations. By concealing these material facts from investors, Barrick supported the artificially inflated price of its securities.

251.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Barrick's securities. In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Barrick, and upon the integrity of the market in which the Company's securities trade, or upon the absence of material adverse information that was recklessly disregarded by Barrick, Regent, Sokalsky, Al-Joundi, Kinver, Potter, and Gonzales but not disclosed in public statements by Barrick, Regent, Sokalsky, Al-Joundi, Kinver, Potter, and Gonzales, Plaintiffs purchased Barrick common stock at artificially inflated prices. As Barrick issued a series of partial but inadequate disclosures, the price of Barrick's securities substantially declined.

252.    At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of Barrick, which was concealed by Barrick, Regent, Sokalsky, Al-Joundi, Kinver, Potter, and Gonzales, Plaintiffs would not have purchased Barrick common stock, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

253.    By virtue of the foregoing, Barrick, Regent, Sokalsky, Al-Joundi, Kinver, Potter, and Gonzales have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

254.    As a direct and proximate result of Barrick's wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in the Company's securities.

255.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Barrick Gold Securities Litigation*, No. 1:13-cv-03851-SAS (S.D.N.Y.), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

### SECOND CAUSE OF ACTION

**Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

256.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

257.    This Cause of Action is asserted against the Individual Defendants (Regent, Sokalsky, Al-Joundi, Kinver, Potter, Gonzales and Veenman) and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

258.    Each of the Individual Defendants was at the time of the wrongs alleged herein a controlling person of Barrick within the meaning of Section 20(a) of the Exchange Act.

259.    By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge of the materially false and misleading statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

260.     The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements of cause the statements to be corrected.  In particular, the Individual Defendants each had direct and supervisory involvement in the day-to-day operations of the Company, particularly with respect to the Pascua-Lama project, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

261.     By reason of the conduct alleged in First Cause of Action, Barrick is liable for violations of Section 10(b) and Rule 10b-5 promulgated thereunder, and the Individual Defendants are liable pursuant to Section 20(a) based on their control of Barrick.

262.     The Individual Defendants are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of Barrick common stock.

263.     Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re Barrick Gold Securities Litigation*, No. 1:13-cv-03851-SAS (S.D.N.Y.), Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

(a) Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)  Awarding Plaintiffs their reasonable costs and expenses incurred in this action; and

(c)  Such other and further relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Plaintiffs hereby demand a trial by jury as to all issues so triable.


Dated: October 27, 2015
        New York, New York

                        LOWENSTEIN SANDLER LLP


                        By:__/s/ Lawrence M. Rolnick_____
                            Lawrence M. Rolnick
                            Marc B. Kramer
                            Michael J. Hampson
                            1251 Avenue of the Americas
                            New York, NY  10020
                            Tel. 212.262.6700

                            *Attorneys for Plaintiffs Highfields Capital I LP,
                            Highfields Capital II LP, and Highfields Capital
                            III L.P.*